

SO ORDERED.

SIGNED this 15th day of May, 2012.

*Dale L. Somers*

_____
Dale L. Somers
United States Bankruptcy Judge

_____

**Designated for online use and print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **BROOKE CORPORATION, et al.,** | **CASE NO.  08-22786** |
| **DEBTORS.** | **CHAPTER 7** |
| **CHRISTOPHER J.  REDMOND,** **Chapter 7 Trustee of Brooke** **Corporation, Brooke Capital** **Corporation (f/k/a Brooke Franchise** **Corporation), and Brooke Investments,** **Inc.; and BROOKE AGENCY** **SERVICES COMPANY LLC,** | |
| **PLAINTIFFS,** | |
| **v.** | **ADV. NO.  10-6245** |
| **THE BANK OF NEW YORK MELLON,** **BNY ASSET SOLUTIONS LLC;** **TEXTRON BUSINESS SERVICES,** **INC.;** **BROOKE ACCEPTANCE COMPANY** **LLC;** **BROOKE CAPTIVE CREDIT** | |

**COMPANY 2003, LLC;
BROOKE SECURITIZATION
COMPANY 2004A, LLC;
BROOKE CAPITAL COMPANY, LLC;
BROOKE SECURITIZATION
COMPANY V, LLC;
BROOKE SECURITIZATION
COMPANY 2006-1, LLC; and
BROOKE CREDIT FUNDING, LLC,**

**DEFENDANTS.**

## MEMORANDUM OPINION GRANTING MOTION TO DISMISS FILED BY TEXTRON BUSINESS SERVICES, INC.

Textron Business Services, Inc. (Textron),[1] has moved to dismiss[2] claims of the Trustee and Brooke Agency Services Company LLC (BASC)[3] for breach of contract for failing to "set aside and distribute" amounts due them for "Level III CP services provided." These claims arise out of contracts for the securitization of loans made to Brooke insurance agents and agencies by Aleritas Capital Corporation (Aleritas) (formerly Brooke Credit Corporation), a subsidiary of Debtor Brooke Corporation. After careful examination of the allegations of the Plaintiffs, the briefs of the parties, and the relevant contracts, the Court holds that Textron did not have an obligation to either set aside or distribute such amounts, and if it did have such a duty, the Trustee and BASC are

---

[1] Textron appears by John W. McClelland and Christine L. Schlomann, of Armstrong Teasdale LLP.

[2] Dkt. 55 (hereafter Motion).

[3] The Trustee and BASC appear by Benjamin F. Mann, Michael E. Norton, John J. Cruciani, and Michael D. Fielding of Husch Blackwell LLP.

2

not parties entitled to sue for breach of those obligations. The Court has jurisdiction.[4]

**APPLICABLE STANDARD.**

Textron moves to dismiss the claims against it under Bankruptcy Rule 7012(b), incorporating Civil Rule 12(b)(6), which provides for dismissal if the complaint fails to state a claim upon which relief can be granted. Textron contends the allegations fail to satisfy the standard adopted by the Supreme Court in *Twombly*[5] and *Iqbal*.[6] Under that standard, the Motion tests the legal sufficiency of the allegations — are they "a short and plain statement of the claim showing that the pleader is entitled to relief," as required by Bankruptcy Rule 7008(a), which incorporates Civil Rule 8(a)(2). Satisfaction of this standard gives "the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[7] Further, to withstand a motion to dismiss, a complaint must contain enough allegations of fact, "accepted as true, 'to state a claim to relief that is plausible on its face.'"[8] "[A] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[4] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. There is no objection to venue, jurisdiction over the parties, or entry of judgment.

[5] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

[6] *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009).

[7] *Twombly* at 555 (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[8] *Iqbal*, 556 U.S. at ___, 129 S.Ct. at 1949 (*quoting Twombly*, 550 U.S. at 570)).

misconduct alleged."[9]  When documents are referred to in the complaint but not attached to it, and they are central to the plaintiffs' claims, the Court on a motion to dismiss may consider indisputably authentic copies supplied by the defendant.[10]

**FINDINGS OF FACT.**

In their Amended Complaint (Complaint),[11] the Chapter 7 Trustee of Debtors Brooke Corporation, Brooke Capital Corporation, and Brooke Investments, Inc. (collectively Debtors), and Brooke Agency Services Company LLC ( BASC), a nondebtor and wholly-owned subsidiary of Brooke Corporation, allege breach of contract claims against Textron.  The contracts allegedly breached are a series of Sale and Servicing Agreements between various special purpose entities (as Issuers of the securities),[12] Textron (as initial Servicer), and Brooke Credit Corporation (a/k/a Aleritas) (as Seller of agent loans to the Issuers).  These agreements are part of the securitization of loans Brooke made to its insurance agents and agencies.  An understanding of the Sale and Servicing Agreements requires examination of Brooke's business and the securitization process as alleged in the Complaint, and as revealed in the controlling securitization documents referred to in the Complaint.

---

[9] *Id.*, 556 U.S. at ___, 129 S.Ct. at 1949.

[10] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[11] Dkt. 45.

[12] The following are the Issuers under the Sale and Servicing Agreements to which Textron was a party:  March 1, 2005, agreement — Brooke Capital Company, LLC;  December 1, 2005, agreement — Brooke Securitization Company V, LLC; July 1, 2006, agreement — Brooke Securitization Company 2006-1, LLC; and August 29, 2006, agreement — Brooke Credit Funding, LLC.

4

Brooke Corporation (Brooke Corp.) was a publicly-traded company which, among other interests, owned 81 percent of Brooke Capital, formerly known as Brooke Franchise Corporation. Brooke Capital, also a publicly-traded company, was an insurance agency and finance company that distributed insurance services through a network of franchisee- and company-owned locations. Brooke Capital is also referred to as the "Franchisor."

In 1996, Brooke Corp. and Brooke Capital (collectively Brooke) developed a franchise model for expansion. Brooke derived most of its revenue from sales commissions earned through its franchisees and from fees for various consulting and brokerage services it provided to the franchisees. Brooke's obligations as the franchisor included performing a substantial part of the back-office functions for the Brooke franchisees, such as assisting them in the collection of insurance premiums and applying the sales commissions they earned. The franchise agreements contemplated that Brooke was the owner of the sales commissions earned by the Brooke franchisees, and that Brooke would remit to each Brooke franchisee its portion of the sales commissions each month, net of the portion that was owed to Brooke as a franchise fee, usually 15% of the earned commissions.

In 1996, Brooke developed a lending program to facilitate the acquisition of existing insurance agencies by Brooke franchisees. To finance this arrangement, the Brooke agencies often obtained loans from Aleritas. The loans were secured by the insurance agency's assets, including the sales commissions earned by the Brooke franchisee. At the time the loans were made, Aleritas entered into Collateral Preservation

5

Agreements with Brooke Capital as the Franchisor, pursuant to which it agreed to assist Aleritas in preserving Aleritas's interest in the collateral, consisting of the franchisee's agency and commissions. Under the Collateral Preservation Agreements, the Franchisor agreed to provide three levels of services, which the Complaint describes as follows:

a. First, "Level I" collateral preservation services generally consisted of the Franchisor performing its obligations under the Franchise Agreement for the benefit of Aleritas. The Franchisor's collection of franchise fees pursuant to the Franchise Agreements constituted its compensation for providing Level I services.

b. Second, "Level II" collateral preservation services consisted of a fairly limited and defined set of consulting services performed by Franchisor before and after closing of the applicable Brooke Insurance Loan. The Brooke Collateral Preservation Agreement provided that each month during the term of the Brooke Insurance Loan, the Franchisor was to be paid an amount equal to one-twelfth of the product of .50% and the outstanding principal balance of the Brooke Insurance Loan (the "Brooke Insurance CPA Fee").

c. Third, "Level III" collateral preservation services ("Level III CP") generally referred to special consulting services with respect to marketing, operations, crisis management and liquidation of a Brooke Insurance Agent. Level III CP also included assisting Aleritas in liquidating the Brooke Agent's business pursuant to a separate agreement, the terms of which (including payment terms) would be negotiated on a business by business basis. In the event the Franchisor was required to provide Level III CP services, Franchisor was entitled to be reimbursed for those services and expenses.

To fund the loans it made to Brooke franchisees, Aleritas began securitizing the Brooke franchise loans in 2003. Under these transactions, agent loans were pooled and consolidated into securities. The securities were eventually sold to investors, which

6

lessened Aleritas's financial exposure on these loans. Between 2003 and 2006, Aleritas securitized seven separate sets of loans that are covered by the Complaint.

In a given securitization, Aleritas assigned to a bankruptcy remote, special purpose entity (SPE), which served as the Issuer, Aleritas's rights and obligations under a group of loans to Brooke franchisees and related Collateral Preservation Agreements. A new Issuer[13] was created for each of the seven securitizations. As reflected in the Indentures (described below to the extent necessary for this opinion), the Issuer then issued one or more series of asset-backed notes to one or more noteholders, with the SPE pledging the loans to Defendant Bank of New York Mellon (BNY Mellon) as Trustee for the benefit of the Noteholders. The notes were to be repaid from revenue (loan payments) generated by the loans in the pool.

Defendant BNY Asset Solutions LLC (BNY Asset) served as the initial Servicer for the first three securitizations, and Defendant Textron served as the initial Servicer for the last four. Through the Sale and Servicing Agreements, one for each securitization, BNY Asset and Textron agreed to service the securitized Brooke franchise loans. The breach of contract claims against BNY Asset and Textron for the alleged failure to properly set aside and distribute amounts due for Level III collateral preservation services arise out of their duties as initial Servicers.

---

[13] In the Complaint, the SPEs are at times identified by number, SPE-1 through SPE-6, and as BCF Warehouse. Although the BCF Warehouse SPE differed from the other securitizations in some respects, the differences are not shown to be relevant to the issues before the Court. It will therefore be treated as identical to the other six transactions.

7

Also to facilitate the Securitizations, the Franchisor assigned its rights and obligations under the Brooke franchise agreements, including the Collateral Preservation Agreements, to a bankruptcy remote, special-purpose entity, BASC, a wholly-owned subsidiary of Brooke Corp. BASC had no employees and no assets. Therefore, BASC, through a Master Agent Servicing Agreement (a separate one for each securitization), agreed that Brooke would perform all of BASC's obligations under the Brooke franchise agreements and the Collateral Preservation Agreements. Thereafter, BASC and BNY Mellon entered into a Master Agent Security Agreement (a separate one for each securitization) in which BASC granted a security interest to BNY Mellon in the sales commissions of the individual franchisees and specified how the sales commissions received by BNY Mellon as Master Agent Trustee from BASC were to be allocated each month. The allegations of breach of contract against BNY Mellon arise out of its performance of the Master Agent Security Agreements.

Thus, each of the securitizations was primarily governed by four agreements: (1) The Indenture; (2) the Sale and Servicing Agreement; (3) the Master Agent Security Agreement; and (4) the Master Agent Servicing Agreement. In their brief in opposition to the Motion, the Plaintiffs describe the functions of these four agreements as follows.[14] The first agreement, the Indenture, outlined the obligations owed by the Issuer (the Brooke Securitization SPE) and the Trustee (BNY Mellon). The primary purpose of the

---

[14] Dkt. 63.

Indenture was to pledge the rights in the securitized Brooke franchise loans to the Trustee (BNY Mellon), for the benefit of the Secured Parties. The Indenture provided that subject to section 4.6 of the Sale and Servicing Agreement, the Issuer was to cause distributions to be made to the Noteholders of principal and interest on the payment dates.

Second, the Sale and Servicing Agreement outlined the obligations among the Issuer (the Brooke Securitization SPE), the initial Servicer (BNY Asset or Textron), and the Seller (Aleritas or Brooke Credit Corporation). The primary purposes of the Sale and Servicing Agreement were to sell the Brooke franchise loans to be securitized to the Issuer, assign the initial Servicer (BNY Asset or Textron) authority to collect and service the Brooke franchise loans, and direct the initial Servicer (BNY Asset or Textron) to instruct the Master Agent Trustee (BNY Mellon) in periodic Servicer's Certificates how to distribute the portion of the sales commissions devoted to loan payments.

The third agreement, the Master Agent Security Agreement, outlined the obligations owed by the Master Agent (BASC) and the Master Agent Trustee (BNY Mellon). The primary purpose of the Master Agent Security Agreement was to insure that all sales commissions collected on behalf of the Brooke franchisees whose loans were in the pool were deposited with the Master Agent Trustee (BNY Mellon) and to direct the Master Agent Trustee how to disperse those funds to the proper parties. Under section 3.3 of the Master Agent Security Agreement, a waterfall provided for distribution of the sales commissions collected by BASC from the insurance companies in the following order of priority: (1) Franchise fees retained by BASC-Brooke for franchise

9

administration; (2) loan payments on securitized loans (administered by BNY Asset or Textron); (3) payments on other loans; and (4) net commissions payable to agents. In section 3.4, the Master Agent Security Agreement established a five-tiered waterfall for the payment of the franchise fee portion of the commissions. In their claims against BNY Mellon, the Plaintiffs argue that collateral preservation fees were to be paid to the Master Agent (BASC) under levels three and five of this section 3.4 waterfall.

The fourth agreement, the Master Agent Servicing Agreement, outlined the obligations owed by the Master Agent Servicer (Brooke Corp.) and the Master Agent (BASC). As a result of the assignment of the franchise agreements and the Collateral Preservation Agreements from Brooke to BASC in connection with the securitizations, BASC was responsible for providing the back-office services to the Brooke franchisees and the related collateral preservation services to the holder of the Brooke franchise loans. Because BASC was a bankruptcy-remote special-purpose entity, BASC lacked the capabilities to provide these services. Therefore, the primary purpose of the Master Agent Servicing Agreement was to engage Brooke to provide these services on behalf of BASC.

**THE COUNTS AGAINST TEXTRON AND THE POSITIONS OF THE PARTIES.**

The Complaint alleges eleven similar claims against Textron arising out of the Sale and Servicing Agreements Textron entered into with the Issuers and Aleritas. They are dated March 1, 2005, December 1, 2005, July 1, 2006, and August 29, 2006. As to each securitization, it alleges that Textron breached the relevant Sale and Servicing Agreement

Case 10-06245    Doc# 81    Filed 05/15/12    Page 10 of 23

"by failing to set aside and distribute amounts due and owing . . . for Level III CP Services provided." The Trustee, BASC, and the Trustee as alter ego of BASC allege separate counts as to three of the securitizations, and only the Trustee and BASC sue as to one of the contracts.[15]

Textron submits that all counts should be dismissed for failure to state a claim on which relief can be granted. Textron argues that the Sale and Servicing Agreements did not impose a duty on Textron to allocate and distribute Level III Collateral Preservation Agreement fees (Level III CP fees).[16] Textron also argues that the Plaintiffs are not parties to the Sale and Servicing Agreements and, based upon clauses in the contracts, are not third parties entitled to sue.

In their brief opposing the Motion to dismiss, BASC and the Trustee argue that BASC and Brooke provided Level III CP services to Brooke franchisees but the Level III CP fees were never paid to BASC and Brooke. They allege Textron agreed to service the Brooke franchise loans, including instructing BNY Mellon how to properly distribute

---

[15] Counts 26, 27, and 28 relate to the March 1, 2005, agreement (one contract of the securitization referred to in the Complaint as the SPE-4 securitization), and allege claims by BASC, the Trustee, and the Trustee as alter ego of BASC. Counts 33 and 34 relate to the December 1, 2005, agreement (one contract of the securitization referred to in the Complaint as the SPE-5 securitization), and allege claims by BASC and the Trustee. Counts 38, 39, and 40 relate to the July 1, 2006, agreement (one contract of the securitization referred to in the Complaint as the SPE-6 securitization), and allege claims by BASC, the Trustee, and the Trustee as alter ego of BASC. Counts 45, 46, and 47 relate to the August 29, 2006, Amended and Restated Sale and Servicing Agreement (one contract of the securititzation referred to in the Complaint as the BCF Warehouse line of credit), and allege claims by BASC, the Trustee, and the Trustee as alter ego of BASC.

[16] Although the materials sometimes refer to "CP fees" and sometimes to "CPA fees," the Court will use "CP fees" except when quoting the materials or discussing a specific provision that uses "CPA fees."

11

funds, and breached that obligation by failing in the Servicer's Certificates to direct BNY Mellon to pay for Level III CP services. As to Textron's third-party-beneficiary defense, the Plaintiffs argue that significant factual questions exist that bar dismissal.

In response, Textron argues that breach based upon the Servicer's Certificates is a new claim, different from the Complaint. However, on the merits, it argues that under the Sale and Servicing Agreements, the Servicer's Certificates were not to include payments for Level III CP services. It refutes the Plaintiffs' position as to third-party-beneficiary status.

**ANALYSIS.**

**A. The Sale and Servicing Agreements did not impose a duty on Textron to "set aside and distribute amounts due . . . for Level III CP services."**

The Plaintiffs allege in the Complaint that Textron breached its contractual duty to set aside and distribute amounts due for Level III CP services. These services are precisely defined in the Complaint as "special consulting services with respect to marketing, operations, crisis management and liquidation of a Brooke Insurance Agent. Level III CP also included assisting Aleritas in liquidating the Brooke Agent's business pursuant to a separate agreement, the terms of which (including payment terms) would be negotiated on a business by business basis."[17] The collateral preservation services also included Level I services, which "generally consisted of the Franchisor performing its

---

[17] Dkt. 45 at ¶ 70(c).

Case 10-06245   Doc# 81   Filed 05/15/12   Page 12 of 23

obligations under the Franchise Agreement for the benefit of Aleritas,"[18] for which the "Franchisor's collection of franchise fees pursuant to the Franchise Agreements constituted its compensation."[19] Level II services were "a fairly limited and defined set of consulting services performed by Franchisor before and after closing of the applicable Brooke Insurance Loan."[20] For these Level II services, "the Franchisor was to be paid an amount equal to one-twelfth of the product of .50% and the outstanding principal balance of the Brooke Insurance Loan."[21]

The only securitization contracts to which Textron was a party are the Sale and Servicing Agreements, one for each of the four securitizations in which Textron was the initial Servicer. The Plaintiffs cite no provision in these contracts expressly referring to payments or distributions of Level III CP fees. At oral argument on BNY Mellon's motion to dismiss, the Plaintiffs quoted one Sale and Servicing Agreement, the one dated July 1, 2006,[22] which obligated Textron to distribute the "Brooke Insurance CPA Fee" to the Master Agent or the Master Agent Servicer. But a close reading of that Sale and Servicing Agreement shows that Textron had duties with respect to the Level II fees, but not the Level III fees which are the subject of the breach of contract claims. Section 3.8

---

[18] *Id.* at ¶ 70(a).

[19] *Id.*

[20] *Id.* at ¶ 70(b).

[21] *Id.*

[22] Dkt. 57-6, 57-7, and 57-8.

Case 10-06245    Doc# 81    Filed 05/15/12    Page 13 of 23

provided that on each payment date, the "Master Agent [BASC] shall be entitled to receive the Brooke Insurance CPA Fee, out of the Collection Account for the related Monthly Period pursuant to <u>Section 4.6</u>."[23]  Section 4.6 created a distribution waterfall, the third level of which provided for distribution to the "Master Agent [BASC]  (or to the Master Agent Servicer [Brooke] on behalf of Master Agent), any accrued and unpaid Brooke Insurance CPA Fee for services rendered with respect to each Brooke Insurance Loan during the related Monthly Period pursuant to the related Collateral Preservation Agreements."[24]  The definition section of the July 1, 2006, Sale and Servicing Agreement defined the "Brooke Insurance CPA Fee" as follows:  "[T]he fee payable to Master Agent (or to the Master Agent Servicer on behalf of Master Agent) for services rendered with respect to the Brooke Insurance Loans during such Monthly Period pursuant to the related Collateral Preservation Agreements, which fee shall be equal to the product of one-twelfth of 0.50% (50 basis points) multiplied by the aggregate Outstanding Principal Balance of the Brooke Insurance Loans on the first day of such Monthly Period."[25]  This is precisely the same amount defined by the Plaintiffs in the Complaint as Level II fees. As to the securitization which included the July 1, 2006, Sale and Servicing Agreement, the Plaintiffs' argument that Textron breached its obligation by failing to set aside and distribute Level III CP fees under the third level of the section 4.6 waterfall is simply

---

[23] Dkt. 57-7 at 18.

[24] Dkt. 57-8 at 7.

[25] Dkt. 57-6 at 5-6.

14

wrong. Distributions of Level III CP fees is not addressed by the July 1, 2006, Sale and Servicing Agreement.

The Sale and Servicing Agreements dated March 1, 2005,[26] and December 1, 2005,[27] likewise do not refer to the Level III CP fees. These contracts also contain no reference to the Level II CP fees. The definition of "Brooke Insurance CPA Fee" is omitted, and no Level II fees are included in either section 3.8 or the waterfall of section 4.6. The Plaintiffs have not identified any section of the August 29, 2006, Amended and Restated Sale and Servicing Agreement[28] that defines CP fees or requires payment of Level III CP fees.

The absence of any reference to the Level III CP fees in the Sale and Servicing Agreements is consistent with the overall operation of the securitization process. The Master Agent Security Agreements between the Master Agent (BASC) and the Master Agent Trustee (BNY Mellon) provide for the segregation of the portion of the sales commissions dedicated to loan payments (and related fees) from the portion of the sales commissions dedicated to the franchise operation.[29] The loan payment portion was administered by Textron, which was responsible for servicing the loans. It was the Master Agent Servicing Agreements between Brooke Franchise Corporation and BASC

---

[26] Dkt. 57-1 and -2.

[27] Dkt. 57-3, -4, and -5.

[28] Dkt. 57-9 and -10.

[29] E.g., Dkt. 57-13 at 12-13.

15

that provided for servicing of the franchises and defined the collateral preservation services and the related fees.[30]  The Level III CP fees which are the subject of the breach of contract claims against Textron are not related to the loan payments that Textron was administering.

**B.  The Sale and Servicing Agreements did not impose a duty on Textron to direct BNY Mellon to distribute funds to pay for collateral preservation services.**

Although they did not allege this in the Complaint,[31] the Plaintiffs argue in their brief in opposition to the Motion that Textron breached the Sale and Servicing Agreements by "failing to direct BNY Mellon on how to properly distribute funds to pay for collateral preservation services pursuant to the securitization documents."[32]  This change in the allegation from a failure to "set aside and distribute" to a "failure to direct BNY Mellon" undoubtedly reflects the Plaintiffs' recognition that under the Sale and Servicing Agreements, Textron did not actually make distributions; rather, under section 3.9 of the March 1, 2005, December 1, 2005, and July 1, 2006, agreements, it periodically provided to BNY Mellon and others Servicer's Certificates which, among other things, contained  "all information necessary to make the distributions required by Section 4.6."[33]

---

[30] E.g., Dkt. 63-1.

[31] The Plaintiffs' attempt to change their breach of contract allegations without amending the Complaint is not sanctioned by the Court.  But since the breach of contract claims fail on the merits whether characterized as a failure to "set aside and distribute" or as a failure to provide a correct Servicer's Certificate, the Court will not deny the informally amended claim on this procedural basis.

[32] Dkt. 63 at 8.

[33] Dkt. 57-2 at 11; Dkt. 57-4 at 14; Dkt. 57-7 at 18.

16

As stated earlier, section 4.6 defined a waterfall specifying the priority of distribution of the loan payment funds and did not include payment of Level III CP fees. Section 3.8 of the August 29, 2006, Amended and Restated Sale and Servicing Agreement required the Servicer to periodically prepare Servicer's Certificates including all information necessary to make the "distributions required by Section 2.05 of the Credit Agreement."[34] That section of the Credit Agreement defines a waterfall setting the priority of distributions similar to that of section 4.6 of the Sale and Servicing Agreements for the earlier transactions; it does not include payment of Level III CP fees.

The Plaintiffs' breach-of-contract claims based upon alleged breaches of the duty to provide accurate certificates therefore fail for the same reason as the claims based upon the alleged failure to distribute Level III CP fees. There is nothing in the Sale and Servicing Agreements requiring Level III CP fees to be included in the Servicer's Certificates. As shown above, the "Brooke Insurance CPA Fee" described in 2a of the section 4.6 waterfall in the July 1, 2006, Sale and Servicing Agreement was defined in that agreement in the same way as the fees identified in the Complaint to be Level II CP fees. These are not the fees which the Plaintiffs allege Textron had a duty to include in the Servicer's Certificates.

**C. Assuming that Textron did breach the Sale and Servicing Agreements, the Plaintiffs are not proper parties to sue for such breach.**

Brooke and BASC allege they are entitled to pursue claims for breach of the Sale

---

[34] Dkt. 57-10 at 9.

Case 10-06245   Doc# 81   Filed 05/15/12   Page 17 of 23

and Servicing Agreements against Textron as third-party beneficiaries of those agreements. But, as examined below in detail, each of the Sale and Servicing Agreements contains a subsection defining those who are considered to be third-party beneficiaries and those who are entitled to any remedy or claim under the agreement. Neither Brooke nor BASC, the parties asserting claims for breach of the Sale and Servicing Agreements, are included in either category.

The Sale and Servicing Agreement dated March 1, 2005, which correlates with Counts 26 through 28 of the Complaint, provides:

> Section 10.6 Third-Party Beneficiaries; Termination. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns, including the Trustee on behalf of the Noteholders pursuant to the Indenture. Each party hereto hereby acknowledges and agrees that each Noteholder is a third-party beneficiary of, and shall have all rights of enforcement as if such Noteholder was actually a party to, this Agreement and that, notwithstanding any other relevant provision of any Related Document, this sentence shall not be amended without the consent of each Noteholder. Nothing in this Agreement, express or implied, shall give to any Person, other than the parties hereto, the Trustee and the Noteholders and their successors hereunder and permitted assigns, any benefit or any legal or equitable right, remedy or claim under this Agreement.[35]

The Noteholders are acknowledged to be third-party beneficiaries. The right to "any benefit or any legal or equitable right, remedy or claim under" the agreement belongs only to: (1) The parties to the agreement (the Issuer, Textron, and Brooke Credit

_____

[35] Dkt. 57-2 at 31.

Corporation (Aleritas)); (2) the Trustee (BNY Mellon); and (3) the Noteholders.

The Sale and Servicing Agreement dated December 1, 2005, which correlates with Counts 33 and 34 of the Complaint, provides:

> Section 10.6.  Third-Party Beneficiaries; Termination. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns, including the Trustee on behalf of the Noteholders pursuant to the Indenture.  Each party hereto hereby acknowledges and agrees that each Noteholder is a third-party beneficiary of, and shall have all rights of enforcement as if such Noteholder was actually a party to, this Agreement and that, notwithstanding any other relevant provision of any Related Document, this sentence shall not be amended without the consent of each Noteholder. Nothing in this Agreement, express or implied, shall give to any Person, other than the parties hereto, the Trustee and the Noteholders and their successors hereunder and permitted assigns, any benefit or any legal or equitable right, remedy or claim under this Agreement.[36]

Like the March 1, 2005, agreement, this version of the Sale and Servicing Agreement acknowledges the Noteholders to be third-party beneficiaries.  The right to "any benefit or any legal or equitable right, remedy or claim under" the agreement belongs only to: (1) The parties to the agreement (the Issuer, Textron, and Brooke Credit Corporation (Aleritas)); (2) the Trustee (BNY Mellon); and (3) the Noteholders.

The Sale and Servicing Agreement dated July 1, 2006, which correlates with Counts 38 through 40 of the Complaint, provides:

> Section 10.6.  Third-Party Beneficiaries; Termination. This

---

[36] Dkt. 57-5 at 13.

> Agreement shall inure to the benefit of and be binding upon
> the parties hereto and their respective successors and permitted
> assigns, including the Trustee on behalf of the Noteholders
> pursuant to the Indenture. Each party hereto hereby
> acknowledges and agrees that each Noteholder and the Swap
> Counterparty is a third-party beneficiary of, and shall have all
> rights of enforcement as if such Noteholder or the Swap
> Counterparty was actually a party to, this Agreement and that,
> notwithstanding any other relevant provision of any Related
> Document, this sentence shall not be amended without the
> consent of each Noteholder and the Swap Counterparty.
> Nothing in this Agreement, express or implied, shall give to
> any Person, other than the parties hereto, the Trustee and the
> Noteholders and their successors hereunder and permitted
> assigns, any benefit or any legal or equitable right, remedy or
> claim under this Agreement.[37]

This provision is similar to the others, but unlike them, it defines third-party beneficiaries

to include the Swap Counterparty, who is defined in the agreement as "Bank of Oklahoma,

N.A. and its successors in interest or any swap counterparty under a replacement Swap

Agreement." Neither Brooke nor BASC is a swap counterparty. They are not parties to

the agreement, nor are they the Trustee or a Noteholder.

Finally, the Amended and Restated Sale and Servicing Agreement dated August 29,

2006, which correlates with Counts 45 through 47 of the Complaint, provides:

> Section 8.6  Third-Party Beneficiaries; Termination. This
> Agreement shall inure to the benefit of and be binding upon
> the parties hereto and their respective successors and permitted
> assigns, including the Agent on behalf of the Secured Parties
> pursuant to the Credit Agreement. Each party hereto hereby
> acknowledges and agrees that each Secured Party is a
> third-party beneficiary of, and shall have all rights of

---

[37] Dkt. 57-8 at 20.

> enforcement as if such Secured Party was actually a party to, this Agreement and that, notwithstanding any other relevant provision of any Related Document, this sentence shall not be amended without the consent of each Secured Party. Nothing in this Agreement, express or implied, shall give to any Person, other than the parties hereto, the Agent and the Secured Parties, and their successors hereunder and permitted assigns, any benefit or any legal or equitable right, remedy or claim under this Agreement. [38]

Neither Brooke nor BASC are parties to the agreement. The Agent is DZ Bank. "Secured Parties," a term defined in the Credit Agreement and having the same meaning in the Amended and Restated Sale and Servicing Agreement,[39] means "collectively, the Lender, the Agent, the Backup Servicer, the Affected Parties, the Hedge Counterparties, the Indemnified Parties and their respective successors and assigns."[40] None of these include Brooke or BASC.[41]

Since the Sale and Servicing Agreements unambiguously exclude Brooke and BASC from the definitions of third-party beneficiaries and expressly limit the parties

---

[38] Dkt. 57-10 at 22.

[39] *See* Dkt. 57-9 at 5 (adopting definitions of "Credit Agreement (as defined below),") and at 6 (defining "Credit Agreement" to mean the "Credit and Security Agreement dated as of August __, 2006, among" Brooke Credit Funding, LLC, Brooke Credit Corporation, Brooke Corp., DZ Bank as agent, and Autobahn Funding Company LLC as lender).

[40] Dkt. 79-52 at 26.

[41] The entities included in the definition of the "Secured Parties" are: (1) the Lender, Autobahn Funding Company LLC; (2) the Agent, DZ Bank; (3) the Backup Servicer, Portfolio Financial Servicing Company; (4) the "Affected Parties," defined in section 2.10 to mean the Lender, the Agent, any Funding Source (meaning DZ Bank and any other source of funds); (5) a Hedge Counterparty to a hedge transaction with Brooke Credit Funding, LLC; and (6) "Indemnified Parties," defined in section 8.01 to mean the Agent, the Lender, each Affected Party, each Hedge Counterparty, and each other Secured Party. Dkt. 79-52, 79-53, and 79-54.

21

entitled to enforce the agreements to persons other than Brooke and BASC, the question when ruling on the third-party beneficiary defense becomes whether these limitations are binding as a matter of law. The answer is yes.

The Sale and Servicing Agreements provide that they are to be governed by and construed in accordance with the laws of the State of New York. Under New York law, "a third party is . . . allowed to enforce a contract if that party is an intended beneficiary of the contract."[42] "The best evidence of the intent to bestow a benefit upon a third party is the language of the contract itself."[43] Therefore, "[w]here a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, . . . that provision is decisive."[44] "Under New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established."[45]

The Court holds that the negating clause in each of the Sale and Servicing Agreements precludes the breach of contract claims brought by the Plaintiffs. The clauses unambiguously evidence an intent to limit the persons who may sue for breach. The Plaintiffs' arguments that there are significant factual issues as to whether they were intended to be benefitted are irrelevant. Even if the Plaintiffs were to benefit from the

---

[42] *Granite Partners, L.P., v. Bear, Stearns & Co., Inc.,* 58 F. Supp.2d 228, 247 (S.D.N.Y. 1999).

[43] *767 Third Avenue LLC v. Orix Capital Markets, LLC*, 26 A.D.3d 216, 218, 812 N.Y.S.2d 8, 11 (N.Y. App. Div. 2006).

[44] *Nepco Forged Prods. v. Consolidated Edison Co.*, 99 A.D.2d 508, 508, 470 N.Y.S.2d 680, 680 (N.Y. App. Div. 1984).

[45] *India.com, Inc., v. Dalal*, 412 F.3d 315, 321 (2nd Cir. 2005).

22

performance of the contracts, the negating clauses clearly state the intent of the parties to the contracts that the Plaintiffs should not have standing to sue for breach.

**CONCLUSION.**

For the reasons examined above, Textron's Motion to dismiss is granted. The allegations of the Complaint do not state claims on which relief can be granted against it. Under the Sale and Servicing Agreements, the only securitization contracts to which Textron is a party, there is no provision requiring Textron to set aside and distribute amounts due for Level III CP fees. Likewise, the agreements did not require Textron to direct in the Servicer's Certificates that BNY Mellon make such payments. Alternatively, even assuming that there were provisions in the Sale and Servicing Agreements imposing a duty on Textron to make or direct such payments, the Plaintiffs would be precluded from bringing breach of contract claims against Textron for failing to fulfill that duty because the Plaintiffs are not parties to the agreements and would be precluded from third-party beneficiary status by the negating clauses in the contracts.

The foregoing constitute Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058, which makes Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

# # #