**SO ORDERED.**

**SIGNED this 15th day of May, 2012.**



_Dale L. Somers_
Dale L. Somers
United States Bankruptcy Judge

_____

Designated for on-line use but not for print publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| **BROOKE CORPORATION, et al.,** | **CASE NO. 08-22786** |
| **DEBTORS.** | **CHAPTER 7** |
| **CHRISTOPHER J. REDMOND,** Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation (f/k/a Brooke Franchise Corporation), and Brooke Investments, Inc.; and **BROOKE AGENCY SERVICES COMPANY LLC,** | |
| **PLAINTIFFS,** | |
| v. | **ADV. NO. 10-6245** |
| **THE BANK OF NEW YORK MELLON; BNY ASSET SOLUTIONS LLC; TEXTRON BUSINESS SERVICES, INC.; BROOKE ACCEPTANCE COMPANY LLC; BROOKE CAPTIVE CREDIT** | |

COMPANY 3002, LLC;
BROOKE SECURITIZATION
COMPANY 2004A, LLC;
BROOKE CAPITAL COMPANY, LLC;
BROOKE SECURITIZATION
COMPANY V, LLC;
BROOKE SECURITIZATION
COMPANY 2006-1, LLC; and
BROOKE CREDIT FUNDING, LLC,

                    DEFENDANTS.

## MEMORANDUM OPINION
## GRANTING IN PART AND DENYING IN PART THE
## MOTION OF BANK OF NEW YORK MELON AND BNY ASSET SOLUTIONS
## LLC TO DISMISS THE AMENDED COMPLAINT

Bank of New York Mellon (BNY Mellon) and BNY Asset Solutions LLC (BNY Asset)[1] (BNY Mellon and BNY Asset shall be collectively referred to as BNY) have moved to dismiss[2] claims of the Chapter 7 Trustee (Trustee) and Brooke Agency Services Company LLC (BASC)[3] for breach of contract for failing to set aside and distribute amounts due them for collateral preservation services provided, for recovery of payments under the theories of quantum meruit and unjust enrichment, and to avoid prepetition transfers as fraudulent transfers or preferences. These claims arise out of the securitization of loans made to Brooke insurance agents and agencies by Aleritas Capital

---

[1] BNY Mellon and BNY Asset appear by Michelle M. Suter of Commercial Law Group, P.A., and Steve R. Smith of Perkins Coie LLP.

[2] Dkt. 56 (hereafter Motion); Dkt. 58 is a memorandum in support of the Motion.

[3] The Trustee and BASC appear by Benjamin F. Mann, Michael E. Norton, John J. Cruciani, and Michael D. Fielding of Husch Blackwell LLP.

2

Corporation (Aleritas) (formerly Brooke Credit Corporation), a subsidiary of Debtor

Brooke Corporation.  The Court has jurisdiction.[4]

After careful consideration of the Plaintiffs' allegations, the briefs of the parties,

the relevant contracts, and the oral arguments of counsel, the Court holds that some of the

breach of contract claims will be dismissed because the Plaintiffs are not parties entitled

to enforce the agreements.  The Motion will be denied as to all other claims.

## APPLICABLE STANDARD.

BNY Mellon and BNY Asset move to dismiss the claims against them under

Bankruptcy Rule 7012(b), incorporating Civil Rule 12(b)(6), which provides for dismissal

if the complaint fails to state a claim upon which relief can be granted.  BNY contend the

allegations fail to satisfy the standard adopted by the Supreme Court in *Twombly*[5] and

*Iqbal*.[6]  Under that standard, the Motion tests the legal sufficiency of the allegations —

are they "a short and plain statement of the claim showing that the pleader is entitled to

relief," as required by Bankruptcy Rule 7008(a), which incorporates Civil Rule 8(a)(2).

Satisfaction of this standard gives "the defendant fair notice of what the . . . claim is and

---

[4] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984.  There is no objection to venue or jurisdiction over the parties.

[5] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

[6] *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009).

the grounds upon which it rests."[7]  Further, to withstand a motion to dismiss, a complaint

must contain enough allegations of fact, "accepted as true, 'to state a claim to relief that is

plausible on its face.'"[8]  "[A] claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."[9]  When documents are referred to in the complaint but not

attached to it, and they are central to the plaintiffs' claims, the Court on a motion to

dismiss may consider indisputably authentic copies supplied by the defendant.[10]

## FINDINGS OF FACT.

In their Amended Complaint (Complaint),[11] the Chapter 7 Trustee of Debtors

Brooke Corporation, Brooke Capital Corporation, and Brooke Investments, Inc.

(collectively Debtors), and BASC, a non-debtor and wholly-owned subsidiary of Brooke

Corporation, seek to recover prepetition expenditures for collateral preservation services

relating to loans made to Brooke insurance agents and agencies.  Recovery is sought on

theories of breach of contract, quantum meruit,[12] and avoidance of transfers under 11

---

[7] *Twombly* at 555 (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[8] *Iqbal*, 556 U.S. at ___, 129 S.Ct. at 1949 (*quoting Twombly*, 550 U.S. at 570)).

[9] *Id.*, 556 U.S. at ___, 129 S.Ct. at 1949.

[10] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[11] Dkt. 45.  The initial complaint alleged claims against Bank of New York Mellon Corporation and BNY Asset, in addition to other defendants.  Bank of New York Mellon Corporation and BNY Asset moved to dismiss.  Dkt. 42.  The Trustee responded by filing the Amended Complaint.  The first motion to dismiss is therefore moot.

[12] Although these claims are labeled "Quantum meruit/Unjust enrichment" in the Complaint, the body of each one mentions only quantum meruit, and the Plaintiffs seem in their brief opposing the

4

U.S.C. §§ 548 and 547.

The contracts allegedly breached by BNY Mellon are a series of Master Agent Security Agreements between Plaintiff BASC (as Master Agent) and BNY Mellon (as Master Agent Trustee). The contracts allegedly breached by BNY Asset are a series of Sale and Servicing Agreements between various special purpose entities (as Issuers of the securities),[13] BNY Asset (as initial Servicer), and Brooke Credit Corporation (a/k/a Aleritas) (as Seller of agent loans to the Issuers). Both sets of contracts are part of the securitization of loans made by Brooke to its insurance agents and agencies. An understanding of the Master Agent Security Agreements and the Sale and Servicing Agreements requires examination of Brooke's business and the securitization process as alleged in the Complaint, and as revealed in the controlling securitization documents referred to in the Complaint.[14]

Brooke Corporation (Brooke Corp.) was a publicly-traded company which, among other interests, owned 81 percent of Brooke Capital, formerly known as Brooke Franchise Corporation. Brooke Capital, also a publicly-traded company, was an insurance agency

---

Motion to dismiss to use "unjust enrichment" solely as a synonym for quantum meruit. Therefore, the Court will discuss only quantum meruit, and ignore the possibility that unjust enrichment might constitute a distinguishable theory.

[13] The following are the Issuers under the Sale and Servicing Agreements to which BNY Asset was a party: April 1, 2003, agreement — Brooke Acceptance Company LLC; November 1, 2003, agreement — Brooke Captive Credit Company 2003, LLC; June 1, 2004, agreement — Brooke Securitization Company 2004A, LLC.

[14] Copies of these documents were not attached to the Complaint, but were supplied to the Court and the Trustee by counsel for BNY Mellon following oral argument. Dkt. 79.

5

and finance company that distributed insurance services through a network of franchisee- and company-owned locations. Brooke Capital is also referred to as the "Franchisor."

In 1996, Brooke Corp. and Brooke Capital (collectively Brooke) developed a franchise model for expansion. Brooke derived most of its revenue from sales commissions earned through its franchisees and from fees for various consulting and brokerage services it provided to the franchisees. Brooke's obligations as the franchisor included performing a substantial part of the back-office functions for the Brooke franchisees, such as assisting them in the collection of insurance premiums and applying the sale commissions they earned. The franchise agreements contemplated that Brooke was the owner of the sales commissions earned by the Brooke franchisees, and that Brooke would remit to each Brooke franchisee its portion of the sales commissions each month, net of the portion that was owed to Brooke as a franchise fee, usually 15% of the earned commissions.

In 1996, Brooke developed a lending program to facilitate the acquisition of existing insurance agencies by Brooke franchisees. To finance this arrangement, the Brooke agencies often obtained loans from Aleritas. The loans were secured by the insurance agency's assets, including the sales commissions earned by the Brooke franchisee. At the time the loans were made, Aleritas entered into Collateral Preservation Agreements with Brooke Capital as the Franchisor, pursuant to which it agreed to assist Aleritas in preserving Aleritas's interest in the collateral, consisting of the franchisee's agency and commissions. Under the Collateral Preservation Agreements, the Franchisor

6

agreed to provide three levels of services, which the Complaint describes as follows:

a. First, "Level I" collateral preservation services generally consisted of the Franchisor performing its obligations under the Franchise Agreement for the benefit of Aleritas. The Franchisor's collection of franchise fees pursuant to the Franchise Agreements constituted its compensation for providing Level I services.

b. Second, "Level II" collateral preservation services consisted of a fairly limited and defined set of consulting services performed by Franchisor before and after closing of the applicable Brooke Insurance Loan. The Brooke Collateral Preservation Agreement provided that each month during the term of the Brooke Insurance Loan, the Franchisor was to be paid an amount equal to one-twelfth of the product of .50% and the outstanding principal balance of the Brooke Insurance Loan (the "Brooke Insurance CPA Fee").

c. Third, "Level III" collateral preservation services ("Level III CP") generally referred to special consulting services with respect to marketing, operations, crisis management and liquidation of a Brooke Insurance Agent. Level III CP also included assisting Aleritas in liquidating the Brooke Agent's business pursuant to a separate agreement, the terms of which (including payment terms) would be negotiated on a business by business basis. In the event the Franchisor was required to provide Level III CP services, Franchisor was entitled to be reimbursed for those services and expenses.

To fund the loans it made to Brooke franchisees, Aleritas began securitizing the Brooke franchise loans in 2003. Under these transactions, agent loans were pooled and consolidated into securities. The securities were eventually sold to investors, which lessened Aleritas's financial exposure on these loans. Between 2003 and 2006, Aleritas securitized seven separate sets of loans that are covered by the Complaint.

In a given securitization, Aleritas assigned to a bankruptcy remote, special purpose

entity (SPE), which served as the Issuer, Aleritas's rights and obligations under a group of loans to Brooke franchisees and related Collateral Preservation Agreements. A new Issuer[15] was created for each of the seven securitizations. As reflected in the Indentures (described below to the extent necessary for this opinion), the Issuer then issued one or more series of asset-backed notes to one or more noteholders, with the SPE pledging the loans to Defendant Bank of New York Mellon (BNY Mellon) as Trustee for the benefit of the Noteholders. The notes were to be repaid from revenue (loan payments) generated by the loans in the pool.

Defendant BNY Asset Solutions LLC (BNY Asset) served as the initial Servicer for the first three securitizations, and Defendant Textron served as the initial Servicer for the last four. Through the Sale and Servicing Agreements, one for each securitization, BNY Asset and Textron agreed to service the securitized Brooke franchise loans. The breach of contract claims against BNY Asset and Textron for the alleged failure to properly set aside and distribute amounts due for Level III collateral preservation services arise out of their duties as initial Servicers.

Also to facilitate the Securitizations, the Franchisor assigned its rights and obligations under the Brooke franchise agreements, including the Collateral Preservation Agreements, to a bankruptcy remote, special-purpose entity, BASC, a wholly-owned

---

[15] In the Complaint, the SPEs are at times identified by number, SPE-1 through SPE-6, and as BCF Warehouse. Although the BCF Warehouse SPE differed from the other securitizations in some respects, the differences are not shown to be relevant to the issues before the Court. It will therefore be treated as identical to the other six transactions.

subsidiary of Brooke Corp. BASC had no employees and no assets. Therefore, BASC, through a Master Agent Servicing Agreement (a separate one for each securitization), agreed that Brooke would perform all of BASC's obligations under the Brooke franchise agreements and the Collateral Preservation Agreements. Thereafter, BASC and BNY Mellon entered into a Master Agent Security Agreement (a separate one for each securitization) in which BASC granted a security interest to BNY Mellon in the sales commissions of the individual franchisees and specified how the sales commissions received by BNY Mellon as Master Agent Trustee from BASC were to be allocated each month. The allegations of breach of contract against BNY Mellon arise out of its performance of the Master Agent Security Agreements.

Thus, each of the securitizations was primarily governed by four agreements: (1) The Indenture; (2) the Sale and Servicing Agreement; (3) the Master Agent Security Agreement; and (4) the Master Agent Servicing Agreement. In their brief in opposition to the Motion, the Plaintiffs describe the functions of these four agreements as follows.[16] The first agreement, the Indenture, outlined the obligations owed by the Issuer (the Brooke Securitization SPE) and the Trustee (BNY Mellon). The primary purpose of the Indenture was to pledge the rights in the securitized Brooke franchise loans to the Trustee (BNY Mellon), for the benefit of the Secured Parties. The Indenture provided that subject to section 4.6 of the Sale and Servicing Agreement, the Issuer was to cause distributions

---

[16] Dkt. 62.

to be made to the Noteholders of principal and interest on the payment dates.

Second, the Sale and Servicing Agreement outlined the obligations among the Issuer (the Brooke Securitization SPE), the initial Servicer (BNY Asset or Textron), and the Seller (Aleritas or Brooke Credit Corporation). The primary purposes of the Sale and Servicing Agreement were to sell the Brooke franchise loans to be securitized to the Issuer, assign the initial Servicer (BNY Asset or Textron) authority to collect and service the Brooke franchise loans, and direct the initial Servicer (BNY Asset or Textron) to instruct the Master Agent Trustee (BNY Mellon) in a Servicer's Certificate how to distribute the portion of the sales commissions devoted to loan payments.

The third agreement, the Master Agent Security Agreement, outlined the obligations owed by the Master Agent (BASC) and the Master Agent Trustee (BNY Mellon). The primary purpose of the Master Agent Security Agreement was to insure that all sales commissions collected on behalf of the Brooke franchisees whose loans were in the pool were deposited with the Master Agent Trustee (BNY Mellon) and to direct the Master Agent Trustee how to disperse those funds to the proper parties. Under section 3.3 of the Master Agent Security Agreement, a waterfall provided for distribution of the sales commissions collected by BASC from the insurance companies in the following order of priority: (1) Franchise fees retained by BASC-Brooke for franchise administration; (2) loan payments on securitized loans (administered by BNY Asset or Textron); (3) payments on other loans; and (4) net commissions payable to agents. In section 3.4, the Master Agent Security Agreement established a five-tiered waterfall for

10

the payment of the franchise fee portion of the commissions. In their claims against BNY Mellon, the Plaintiffs argue that collateral preservation fees were to be paid to the Master Agent (BASC) under levels three and five of this section 3.4 waterfall.

The fourth agreement, the Master Agent Servicing Agreement, outlined the obligations owed by the Master Agent Servicer (Brooke Corp.) and the Master Agent (BASC). As a result of the assignment of the franchise agreements and the Collateral Preservation Agreements from Brooke to BASC in connection with the securitizations, BASC was responsible for providing the back-office services to the Brooke franchisees and the related collateral preservation services to the holder of the Brooke franchise loans. Because BASC was a bankruptcy-remote special entity, BASC lacked the capabilities to provide these services. Therefore, the primary purpose of the Master Agent Servicing Agreement was to engage Brooke to provide these services on behalf of BASC.

**THE COUNTS AGAINST BNY MELLON AND BNY ASSET.**

The first count of the Complaint is a demand by the Trustee and BASC against BNY Mellon and each of the SPE Issuers for an accounting.[17] They allege that the Trustee does not have access to all the records, books, and accounts relating to the flow of money through the securitizations and requires such information to determine the amounts which may be due or recoverable by the Trustee and BASC

The Complaint alleges 30 claims for recovery of Level III collateral preservation

---

[17] As stated in the Complaint, the claim appears to be asserted by the Trustee alone, but in their brief, the Plaintiffs refer to it as being asserted by BASC as well. Dkt. 62 at 6, n. 6.

Case 10-06245    Doc# 83    Filed 05/15/12    Page 11 of 53

fees ("Level III CP fees").  Twenty-one similar claims[18] are alleged against BNY Mellon for breach of the Master Agent Security Agreements, three claims for each of the seven securitizations.  For each securitization, an identical claim for breach of contract is asserted against BNY Mellon by:  (1) BASC, a party to each Master Agent Security Agreement; (2) the Trustee, based upon the allegation that Brooke Corp. was an intended beneficiary of the Master Agent Security Agreements; and (3) the Trustee on behalf of Brooke Corp. as the alter ego of BASC.  For each claim, the Plaintiffs allege BNY Mellon "breached its obligations by failing to set aside and distribute amounts due and owing . . . for Level III CP services provided."[19]

The Complaint also alleges nine similar claims against BNY Asset for recovery of the Level III CP fees.  These claims are for breach of the Sale and Servicing Agreements for the first three securitizations.  For each of these securitizations, an identical claim for breach of contract is asserted against BNY Asset by:  (1) BASC; (2) the Trustee, based upon the allegation that BASC and Brooke Corp. were intended beneficiaries of the Sale and Servicing Agreements; and (3) the Trustee on behalf of Brooke Corp, based upon the allegation that BASC and Brooke Corp. were each intended beneficiaries of the Sale and Servicing Agreements.  As to each claim for breach of contract, it is alleged that BNY Asset breached the relevant Sale and Servicing Agreement "by failing to set aside and

---

[18] The differences in the claims are the identification of the Plaintiff.

[19] *E.g.*, Dkt. 45, Count 2.

12

distribute amounts due and owing . . . for Level III CP services provided."[20]

For each securitization, the Trustee alone alleges a claim against BNY Mellon and the special purpose entity (SPE) which issued the securities pursuant to the applicable Indenture for quantum meruit. The Trustee alleges that Brooke Corp. or Brooke Capital provided valuable collateral preservation services for the benefit of BNY Mellon and the SPE, that BNY Mellon had knowledge of the benefit, that BNY Mellon and the SPE accepted the benefit, and that it would be inequitable for BNY Mellon and the SPE to retain the benefit without payment to Brooke Corp. or Brooke Capital. On each of these claims, the Trustee seeks to recover an amount in excess of $75,000. These counts of the Complaint are not expressly limited to recovery for Level III CP services.

The Trustee alone also asserts against BNY Mellon and the seven SPEs two bankruptcy claims, one for recovery of constructively fraudulent conveyances and one for recovery of preferential transfers, in the alternative. The focus of these claims is the transfer of funds alleged to have been the property of Debtors Brooke Corp. or Brooke Capital from the Consolidated Receipts Trust Account to the Master Receipts Trust Account, which were then used to pay the securitized loan obligations of underperforming Brooke agents. As to the fraudulent transfer claims asserted under 11 U.S.C. § 548[21] and Kansas state law, it is alleged that since Debtors did not owe these obligations, the transfers were for less than reasonably equivalent value, and that Debtors

---

[20] *E.g.*, Dkt. 45, Count 5.

[21] Future references in the text to sections of title 11 shall be to the section number only.

13

were continuously insolvent during the four years preceding their filing for bankruptcy. As to the preference claims under § 547, it is alleged that, to the extent Brooke Corp. or Brooke Capital had obligations to make such payments relating to underperforming agents, the transfers were on account of antecedent debts, were made while Debtors were insolvent, were made within one year before Debtors filed for relief, and allowed the Defendants to receive more than they otherwise would have received had the payments not been made. The Trustee seeks to recover these avoidable transfers under § 550 from BNY Mellon, which is alleged to have been an insider.

**BNY MELLON'S AND BNY ASSET'S ARGUMENTS IN SUPPORT OF DISMISSAL.**

BNY present multiple arguments in support of dismissal, some of which address all the claims and others of which are more specific. The contentions briefed in support of the Motion are that: (1) *Stern v. Marshall* mandates dismissal for lack of subject matter jurisdiction; (2) the claims in the amended Complaint are untimely and BASC is an improper party; (3) the common law claims are barred by the Plaintiffs' admitted fraud and contract breaches; (4) the terms of the relevant contracts bar the claims for fees for Level III CP services; (5) the Trustee's fraudulent conveyance and preference claims fail; and (6) the accounting and disallowance claims must be dismissed. The Trustee and BASC argue that none of the foregoing theories require dismissal.

**HOLDINGS ON THE MERITS OF THE MOTION.**

**A. *Stern v. Marshall* does not require dismissal.**

14

### 1.  The Parties' contentions.

BNY contend that the Court lacks jurisdiction to adjudicate the claims for breach of contract, unjust enrichment, and constructively fraudulent conveyances.  The position is presented as a discussion of *Stern v. Marshall*.[22]  The Plaintiffs respond that *Stern* does not address jurisdiction; it addresses the allocation of authority to enter final judgments between the bankruptcy courts and the district courts.

### 2.  Analysis.

The limited jurisdiction of bankruptcy courts is presently the subject of much discussion because of the United States Supreme Court's 2011decison in *Stern v. Marshall*.  *Stern* held that despite the specification in 28 U.S.C. § 157(b)(2)(C) that core proceedings include "counterclaims by the estate against persons filing claims against the estate," a bankruptcy court lacks the "constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."[23]  Constitutional authority for a bankruptcy court to enter a final judgment on such a counterclaim is present only if the "action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."[24]  Otherwise, only an Article III court can enter a final judgment on such a claim.  *Stern* did not address how the bankruptcy court should have proceeded as to the counterclaim before it, since a state

---

[22] ___ U.S. ___, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

[23] 131 S. Ct. at 2620.

[24] 131 S. Ct. at 2618.

law decision entitled to preclusive effect on the counterclaim had been entered after the bankruptcy court's judgment was entered.

The extent of the lack of bankruptcy court authority to enter final judgments based upon *Stern* has not been decided in this circuit, and generally is an unsettled question. Some courts rely upon the language in *Stern* emphasizing that the ruling should be limited to the unique circumstances of that case,[25] which involved only the listing of estate counterclaims against persons filing claims against the estate as "core proceedings" in 28 U.S.C. § 157(b)(2)(C). It is argued that *Stern* does not impact the bankruptcy court's ability to enter a final judgment on any type of core proceeding listed in the other subsections of 28 U.S.C. § 157(b)(2).[26] Other courts read *Stern* more expansively, by looking to its reasoning.[27]

This case does not involve state law counterclaims, so the *Stern* holding that 28 U.S.C. § 157(b)(2)(C) is unconstitutional has no direct application. Further, as urged by the Plaintiffs, *Stern* does not address the subject matter jurisdiction of the bankruptcy

---

[25] *E.g., In re Salander O'Reilly Galleries*, 453 B.R. 106, 115-17 (Bankr. S.D.N.Y. 2011).

[26] *E.g., Brook v. Ford Motor Credit Co. (In re Peacock)*, 455 B.R. 810, 812 (Bankr. M.D.Fla. 2011) ("The narrow holding in *Stern*, as just described, does not impact a bankruptcy court's ability to enter a final judgment in any other type of core proceeding authorized under 28 U.S.C. § 157(b)(2). Similarly, *Stern* does not impact a bankruptcy court's ability to hear non-core matters under 28 U.S.C. § 157(c), albeit not decide them absent the parties' consent.").

[27] *E.g., Heller Ehrman LLP v. Arnold & Porter, LLP (In re Heller Ehrman LLP)*, 464 B.R. 348, 352-54 (N.D. Cal. 2011) (finding that *Stern*'s holding of lack of jurisdiction to enter final judgment applies to other core matters under § 157(b), including estate's claim that prebankruptcy waiver was fraudulent conveyance); *Meoli v. Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 456 B.R. 318, 338 (Bankr. W.D. Mich. 2011) (holding bankruptcy court lacked constitutional authority to enter multimillion dollar judgment against transferee on avoided transfer except with parties' consent).

16

courts over claims asserted in bankruptcy proceedings; it addresses only the allocation of authority to enter final judgments on matters referred to the bankruptcy courts. But since BNY has questioned subject matter jurisdiction, the Court will consider the issue.

Federal district courts have jurisdiction over title 11 cases, civil proceedings in title 11 cases, and property of the title 11 estate.[28] This jurisdiction is original and exclusive as to the title 11 case itself and the property of the estate, but district courts have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."[29] Procedures in bankruptcy cases are addressed by 28 U.S.C. § 157. Subsection (a) provides that each district court shall refer to the bankruptcy court "any and all cases under title 11 and any and all proceedings arising under title 11 or arising in or related to case under title 11." Under subsection (b), a bankruptcy court may hear and determine all cases under title 11 and all "core proceedings," including the examples listed in subsection (b)(2). However, under subsection (c)(1), with respect to a related matter, the bankruptcy court may hear such a proceeding, but shall submit proposed findings of fact and conclusions of law to the district court, which will then enter a final judgment after considering such proposals. Thus, 28 U.S.C. § 157 creates two categories of proceedings: (1) core matters for which the bankruptcy court can enter a final judgment; and (2) related proceedings for which the bankruptcy court submits suggested findings and conclusions to the district court for review and entry of judgment.

---

[28] 28 U.S.C. § 1334 (a), (b), and (e).

[29] *Id.*

The "'test for determining whether a civil proceeding is related in bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'"[30] "Civil proceedings encompassed by . . . 'related proceedings' are those whose outcome could conceivably have an effect on the bankruptcy estate and that (1) involve causes of action owned by the debtor that became property of a title 11 estate under section 541 . . . , or (2) are suits between third parties that 'in the absence of bankruptcy, could have been brought in a district court or a state court.'"[31]

The majority of claims which BNY move to dismiss for lack of subject matter jurisdiction are common-law breach-of-contract claims brought by the Trustee and by BASC. They do not appear on the list of core matters, but are within the Court's jurisdiction as related-to matters. The Trustee's breach of contract claims arose prepetition and became property of the estate under § 541. The claims asserted by BASC are causes of action between third parties whose outcome could conceivably have an effect on the bankruptcy estates. The possibility of effect on the bankruptcy estates arises from the facts that BASC is a wholly-owned subsidiary of Debtor Brooke Corp. and that BASC, through Debtor Brooke Capital, performed important functions in the

---

[30] *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990) (*quoting Pacor, Inc., v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984)).

[31] 1 *Collier on Bankruptcy*, ¶ 3.01[3][e][ii] at 3-17 to 3-18 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2012) (*citing Halper v. Halper*, 164 F.3d 830 (3rd Cir. 1999) and *In re Colorado Energy Supply, Inc.*, 728 F.2d 1283, 1286 (10th Cir. 1984)).

18

securitization process at issue in the Trustee's claims. Resolution of BASC's claims will require adjudication of the relationships and duties created by the various securitization contracts. Resolution of the Trustee's claims likewise will require such adjudications. If BASC were required to sue in a separate proceeding in a different court, there would be a possibility of inconsistent rulings. Further, since BASC is a wholly-owned subsidiary of Brooke Corp., any benefit recovered by BASC would indirectly benefit the estate. As to the contract claims, the Court has authority to hear them and submit proposed findings and conclusions to the district court, unless the parties consent to this Court's entry of a judgment.

The preferential transfer claims by the Trustee against BNY Mellon are core proceedings as designated by 28 U.S.C. § 157(b)(2)(F). Federal law is the basis for recovery. The bankruptcy court has jurisdiction to both hear the claims and enter a final judgment on them.

The constructively fraudulent transfer claims by the Trustee against BNY Mellon are also core proceedings, as designated by 28 U.S.C. § 157(b)(2)(H). But the basis for recovery includes state law, and there is no contention that the fraudulent transfer claims will be determined in the claims allowance process. Some courts have held that under *Stern*, only an Article III court can enter a final judgment on such claims.[32] Assuming, but not deciding, that reasoning applies here, then the question is whether this means the

---

[32] *E.g., Teleservices Group*, 456 B.R. at 338.

Case 10-06245    Doc# 83    Filed 05/15/12    Page 19 of 53

Court merely lacks jurisdiction to enter a final judgment on the fraudulent transfer claims, or whether it lacks any authority to hear the claims at all, such that the claims must be dismissed.

Based upon the Seventh Circuit's decision in *Ortiz*,[33] BNY argue that dismissal is required. In *Ortiz*, two groups of debtors sued a creditor that was a medical care provider for allegedly violatiing state law by revealing personal medical information in proofs of claim it filed in bankruptcy court. The district court denied motions to withdraw reference, finding the claims to be "core proceedings involving counterclaims by the debtors' bankruptcy estate[s] against a claimant."[34] The bankruptcy court dismissed the complaints, and a direct appeal to the court of appeals was permitted. *Stern* was decided after argument, causing the appellate court to request additional briefing on three issues relating to its jurisdiction, including whether the bankruptcy court had constitutional authority to issue final judgments dismissing the complaints. After examining the *Stern* decision, the Seventh Circuit held that the claims owed their existence to state law and would not necessarily be resolved in the claims allowance process, and therefore, the bankruptcy judge lacked the authority required under Article III to enter final judgments. This meant the bankruptcy judge's orders could not function as final judgments for purposes of appellate jurisdiction. The Seventh Circuit also held that the orders could not function as the proposed findings of fact and conclusions of law required by 28

---

[33] *Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 665 F.3d 906 (7th Cir. 2011).

[34] Id. at 910,

Case 10-06245    Doc# 83    Filed 05/15/12    Page 20 of 53

U.S.C.§ 157(c)(1) for related matters, since the matters fit one of the statutory categories of core proceedings. According to BNY, this means that, because the fraudulent transfer claims are core proceedings as specified by § 157(b)(2)(H) but must be decided by an Article III court, the bankruptcy court lacks jurisdiction to enter proposed findings of fact and conclusions of law, and must dismiss the claims.

The Trustee argues that this construction of *Stern* and *Ortiz* would assign the fraudulent conveyance claims to a jurisdictional "no man's land," and is inconsistent with the Supreme Court's analysis in *Stern* and the decisions of other courts. He acknowledges that *Stern* has created a third category of bankruptcy proceedings which are neither category one "core" proceedings nor category two "related to" proceedings. This new category consists of proceedings which, although called "core" under 28 U.S.C. § 157(b)(2), involve private rights that the Constitution requires to be finally adjudicated by an Article III judge. As to these proceedings, he argues that the bankruptcy court should make suggested findings of fact and conclusions of law for de novo review by the district court, the same procedure that applies to category one proceedings.

This suggested procedure is supported by the *Stern* majority, who noted that the counterclaim defendant had "not argued that the bankruptcy courts 'are barred from "hearing" all counterclaims' or proposing findings of fact and conclusions of law on those matters,"[35] and then stated "[w]e do not think the removal of counterclaims such as [the

---

[35] 131 S.Ct. at 2620.

Case 10-06245   Doc# 83   Filed 05/15/12   Page 21 of 53

one before it] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute."[36] The Trustee's position is also persuasively supported by the decision of the *Ortiz* bankruptcy court following remand from the Seventh Circuit.[37] That court found that as to the state law claim, it could use the procedures of 28 U.S.C. § 157(c)(1) applicable to related matters, and issue proposed findings of fact and conclusions of law. It distinguished the portion of the Seventh Circuit's decision relied upon here by BNY as addressing appellate jurisdiction.[38] It found that *Stern* strongly suggested this procedure "by describing the removal of [the] counterclaim from core bankruptcy jurisdiction in the context of the proposed findings procedure of § 157(c)."[39] In further support of its position, the *Ortiz* bankruptcy court noted that numerous district court and bankruptcy court decisions have held that bankruptcy courts are authorized to submit proposed findings when a bankruptcy court cannot constitutionally enter a final order on a matter designated as core.[40] It also observed that the United States District

---

[36] *Id.*

[37] *Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 464 B.R. 807 (Bankr. E.D. Wis. 2012).

[38] *Id.* at 810.

[39] *Id.* at 810-811.

[40] *Id.* at 811. The cases cited by Ortiz are: *RES–GA Four LLC v. Avalon Builders of GA LLC*, 2012 WL 13544, at *8–9, 2012 U.S. Dist. LEXIS 485, at *28 (M.D. Ga. Jan. 4, 2012); *JustMed, Inc. v. Byce (In re Byce)*, 2011 WL 6210938, at *5, 2011 U.S. Dist. LEXIS 144115, at *14–15 (D. Idaho Dec. 14, 2011); *Levey v. Hanson's Window & Constr., Inc. (In re Republic Windows & Doors, LLC)*, 460 B.R. 511, 518 (Bankr. N.D. Ill. 2011); *Heller Ehrman LLP v. Arnold & Porter, LLP (In re Heller Ehrman LLP)*, 2011 WL 4542512, at *3, 2011 Bankr. LEXIS 3764, at *9 (Bankr. N.D. Cal. Sept. 28, 2011); *Samson v. Western Capital Partners LLC (In re Blixseth)*, 2011 WL 6217416, 2011 Bankr. LEXIS 4887 (Bankr. D. Mont. Dec. 14, 2011).

Court for the Southern District of New York has issued a standing order "to provide that the district court can treat any order of the bankruptcy court as proposed findings and conclusions of law in the event the district court concludes that the bankruptcy judge constitutionally could not have entered a final order or judgment."[41]  Agreeing with these authorities, the Court concludes that even if it cannot constitutionally enter a final judgment on the fraudulent transfer claims, it can hear the claims and enter proposed findings of fact and conclusions of law using the procedure of 28 U.S.C. § 157(c)(1).[42]

For the foregoing reasons, BNY's motion to dismiss based upon *Stern v. Marshall* is denied.

**B.  The Complaint will not be dismissed as untimely filed, or because BASC is not a proper party.**

**1.  The Parties' contentions.**

BNY's argument under this theory for dismissal is based upon the following facts. The original complaint was filed on October 27, 2010, by the Trustee against Bank of New York Mellon Corporation and others, but not BNY Mellon.  On September 20, 2011, Bank of New York Mellon Corporation moved to dismiss.  On October 21, 2011, the Trustee responded by filing the amended complaint (referred to in this opinion as the Complaint), adding BASC as a plaintiff, adding BNY Mellon as a defendant, and deleting

_____

[41] *Id*. (*citing* Amended Standing Order of Reference, 12 MISC-00032 (S.D.N.Y. Jan.  31, 2012), *available at* http://www.nysd.uscourts.gov/courtrules.php).

[42] Since the constitutional authority of this Court with respect to the fraudulent transfer claims is irrelevant to the pretrial procedures to be employed, the Court declines at this stage in the proceeding to decide whether an Article III court must make the final decision on these claims.

23

Bank of New York Mellon Corporation, the parent of BNY Mellon, as a defendant.

BNY contend the amended complaint as to BNY Mellon and BASC should be dismissed as untimely. As to BASC, BNY also argue that it is improper for the Trustee to include it as a new plaintiff in the amended complaint since it is a non-debtor and the Trustee offers no basis for his authority to bring claims on behalf of BASC.

As to the timeliness of the claims asserted by BASC, the Trustee relies upon the principle that "[a] plaintiff may be added to a petition and the newly-added plaintiff may relate back to a petition to which she was not a party so long as the newly-added plaintiff's claims involve the same occurrences and transactions as those alleged in the original petition."[43] He contends authority to sue on behalf of BASC has been granted by an October 2010 corporate resolution of BASC authorizing litigation and giving Brooke Corp. authority to make all decisions and take all relevant actions on behalf of BASC.

### 2. Analysis.

Rule 15 of the Civil Rules, made applicable to adversary proceedings by Bankruptcy Rule 7015, addresses amended and supplemental pleadings.[44] Subsection (c) provides as follows regarding relation back of amendments:

**(1)** **When an Amendment Relates Back.** An amendment to a

---

[43] Dkt. 62 at 12.

[44] Subsection (a)(1) of Rule 15 allows one amendment as a matter of course within strict time limits which were not satisfied here. Subsection (a)(2) provides that leave of court is required for amendments outside the time limits of (a)(1) and that such leave should be "freely give[n] when justice so requires." Although the Trustee did not request leave, undoubtedly leave would have been granted. BNY do not make an issue of the lack of a motion and order allowing the amendment.

Case 10-06245    Doc# 83    Filed 05/15/12    Page 24 of 53

pleading relates back to the date of the original pleading when:

**(A)** the law that provides the applicable statute of limitations allows relation back;

**(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading; or

**(C)** the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

> **(i)** received such notice of the action that it will not be prejudiced in defending on the merits; and

> **(ii)** knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

The amendment changing the defendant from Bank of New York Mellon Corporation to BNY Mellon falls squarely within subsection (c)(1)(C), and therefore the filing date relates back to the date of the original complaint. As to BNY Mellon, the amended complaint alleges claims that "arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." There is no doubt that BNY Mellon knew that the action would have been brought against it but for a

mistake concerning the proper party's identity.[45]  Relation back of amendments under

Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not

on the amending party's knowledge.[46]

Relation back also applies to the claims asserted by BASC, so that for purposes of

the statute of limitations, BASC's claims were filed on October 10, 2010.  Rule 15(c)

does not expressly apply to a new complaint adding a plaintiff.  But it has been applied by

analogy to such amendments.[47]  Relation back of amendments adding plaintiffs is

addressed by Wright & Miller as follows:

> As long as defendant is fully apprised of a claim arising from
> specified conduct and has prepared to defend the action,
> defendant's ability to protect itself will not be prejudicially
> affected if a new plaintiff is added, and defendant should not
> be permitted to invoke a limitations defense. This seems
> particularly sound inasmuch as the courts will require the
> scope of the amended pleading to stay within the ambit of the
> conduct, transaction, or occurrence set forth in the original
> pleading.
>
> Courts deciding whether to allow amendments
> changing plaintiffs to relate back to the filing of the original
> complaint seem to concentrate on the notice and
> identity-of-interest factors as they do in the case of
> amendments changing defendants.  Relation back thus will be
> permitted unless the court finds that defendant did not have
> adequate notice or that the new and the existing plaintiffs did

---

[45] See Dkt. 43 (the arguments of Bank of New York Mellon Corporation and BNY Asset in support of dismissal of the original complaint appear to assume Bank of New York Mellon Corporation served as the Master Agent Trustee and Indenture Trustee, when in fact, BNY Mellon served these roles).

[46] *Krupski v. Costa Crociere S.p.A.*, ___ U.S. ___, 130 S.Ct. 2485, 2493-96, 177 L.Ed.2d 48 (2010).

[47] *Brauer v. Republic Steel Corp.*, 460 F.2d 801, 804 (10th Cir. 1972).

26

> not share a sufficient identity of interest. Thus, an
> amendment substituting a new plaintiff has been held to relate
> back if the added plaintiff is the real party in interest. As the
> Advisory Committee Note to the 1966 amendment to Rule
> 15(c) indicates, the liberal attitudes toward substitution of the
> real party in interest prescribed by both Rule 17(a) and Rule
> 15(c) are closely related.[48]

The foregoing standard is satisfied as to the addition of BASC as a plaintiff in the amended complaint. The claims presented in the original complaint by the Trustee and the claims asserted by BASC in the amended complaint arise out of the same transactions. The Defendants had notice of the claims of BASC. The original complaint contained factual allegations regarding BASC's role in the securitizations. And in the original complaint, the Trustee, relying on a third-party-beneficiary rationale, alleged causes of action against BNY Mellon for breach of the Master Agent Security Agreements to which BNY Mellon and BASC are parties. In the amended pleading, BASC alleges these same breach of contract claims. There is an identity of interest between the Trustee and BASC based on the allegations in the Complaint that Brooke Corp. disregarded the fact that Brooke Corp. and BASC were separate entities and that Brooke Corp. is the alter ego of BASC. Further, BASC is a subsidiary of Debtor Brooke Corp., and the Trustee has been authorized by the board of directors of BASC to act on its behalf in litigation.

Even if relation back did not apply to the addition of BASC's claims, BASC correctly argues that the statue of limitations for some of the breach of contract claims it

---

[48] 6A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure: Civil,* 3d, § 1501 at 212-22 (2010).

has alleged in the amended pleading had not expired before the amended pleading was filed. The limitations period for breach of contact claims is 6 years under New York law,[49] the law which the contracts selected to govern the agreements and their construction. The Indenture for the earliest of the securitizations is dated as of April 1, 2003, and the latest is dated August 29, 2006. The amended complaint was filed on October 21, 2011, less than 6 years after any breaches occurring on or after October 21, 2005. The alleged dates of the breaches are not stated, but it is clear that some or all of the breach of contract claims for failure to pay Level III CP fees were timely filed without regard to relation back.

BNY also argue that BASC is not a proper plaintiff. First, BNY argue that because BASC is not a debtor, it cannot be a plaintiff. BNY provide no authority for this position, and the Court knows of no rule limiting plaintiffs in adversary proceedings to debtors. BASC's close relationship to the claims asserted by the Trustee was examined briefly above. Second, BNY submit that the alter ego doctrine is insufficient to confer jurisdiction over BASC's claims.[50] This argument in support of dismissal is based upon the factual allegation of the Complaint that BASC was the alter ego of Brooke Corp.,[51] and the position that under Kansas law a corporation cannot apply the alter ego doctrine

---

[49] N.Y. Civ. Prac. Law & Rules § 213 (McKinney 2004). Since BASC is not a debtor, the two-year grace period of § 108(a)(2) of the Bankruptcy Code is not applicable.

[50] Dkt. 58 at 28-29.

[51] *E.g.*, Dkt. 45 at ¶ 152.

as a sword to vindicate its own interests.  But BNY misunderstand the relationship of the alter ego allegation to the claims asserted by BASC.  BASC is suing in its own right, not as an alter ego of Brooke.  Alter ego has nothing to do with BASC's status as a separate plaintiff and is rejected as a basis to find that BASC is not a proper party.[52]

BNY's arguments that the claims were not timely filed and that BASC is not a proper party do not provide a basis to dismiss.

**C.  The Court rejects BNY's argument that the common law claims are barred by the Plaintiffs' admitted fraud and contract breaches.**

**1.  The Parties' positions.**

BNY contend, based upon the Complaint's allegations of Debtors' and BASC's wrongful conduct, that the doctrine of *in pari delicto* applies to bar all of the common law claims.  In addition, BNY assert that BASC's breach of contract claims are barred because the Complaint contains admissions of breaches of the Master Agent Security Agreements. The Plaintiffs respond that *in pari delicto* does not apply to the factual circumstances of this case, and contend that the breach of contract claims are not subject to dismissal because of conduct admitted in the Complaint.

**2.  Analysis.**

The phrase *in pari delicto* means "equally at fault."[53]  "The doctrine of in pari

---

[52] When moving to dismiss, BNY do not include their interpretation of the Kansas alter ego doctrine with respect to the breach of contract claims asserted by Brooke Corp. as alter ego of BASC. The Court therefore does not consider whether alter ego is properly alleged for this purpose.

[53] Black's Law Dictionary (9th ed. 2009).

29

delicto mandates that the courts will not intercede to resolve a dispute between two wrongdoers."[54]  It is closely related to the clean-hands maxim, but rather than focusing on one party's misconduct, it focuses on the transaction as a whole; the objection is not to one person's unclean hands but to the whole unlawful enterprise.[55]  It serves important public policy purposes.  "First, denying judicial relief to an admitted wrongdoer deters illegality. Second, in pari delicto avoids entangling courts in disputes between wrongdoers."[56]  It is often applied as between parties to a fraudulent or illegal transaction.[57]  "The justice of the in pari delicto rule is most obvious where a willful wrongdoer is suing someone who is alleged to be merely negligent."[58]

The *in pari delicto* defense serves as a complete bar to an action asserted by a plaintiff who is equally at fault with the defendant for the wrongdoing giving rise to the plaintiff's claim.  It is an affirmative defense[59] governed by the law applicable to the underlying claim.  New York law is selected as the applicable law in the Master Agent Security Agreements and the Sale and Servicing Agreements, the contracts which the Trustee and BASC contend were breached.  When moving to dismiss the Complaint based

---

[54] *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464, 938 N.E.2d 941, 950 (2010).

[55] 27A Am. Jur. 2d, *Equity*, § 103 (database updated Feb. 2012).

[56] *Kirschner v. KPMG LLP*, 15 N.Y.3d at 464.

[57] 27A Am. Jur. 2d, *Equity*, § 103.

[58] *Kirschner v. KPMG LLC*, 15 N.Y.3d at 464.

[59] *Id.* at 459, n. 3.

30

upon this affirmative defense, the Defendants have the burden to show that, as a matter of

law, the allegations of the Complaint satisfy the *in pari delicto* doctrine under New York

law.[60]

   Under New York law, to dismiss on the basis that a plaintiff is *in pari delicto*

"requires immoral or unconscionable conduct that makes the wrongdoing of the party

against which it is asserted at least equal to that of the party asserting it."[61] Although in

New York, the doctrine of *in pari delicto* applies to breach of contract claims,[62] "[c]ases

applying the doctrine generally look for wrongful conduct that is directly connected to the

contract."[63]  Further, "[a]n agreement which is 'lawful on its face and which does not

contemplate or necessarily entail unlawful conduct in its performance is enforcible by the

promisee even though he engages in unlawful activity in the agreement's performance,'

provided the promisee does not require the aid of the illegal transaction to make out his

case."[64]

   In this case, BNY allege the common law claims, including the breach of contract

claims, should be dismissed because the Trustee and BASC are *in pari delicto* based upon

---

   [60] *See Granite Partners, L.P., v. Bear, Stearns & Co. Inc.*, 17 F. Supp.2d 275, 309, n.18
(S.D.N.Y. 1998).

   [61] *Chemical Bank v. Stahl*, 237 A.D.2d 231, 232, 655 N.Y.S.2d 24, 25 (N.Y. App. Div. 1997).

   [62] *Globaltex Group Ltd. v. Trends Sportswear Ltd.,* 2010 WL 1633438, *3-4 (E.D.N.Y. Apr. 21,
2010).

   [63] *Id.*

   [64] *Hilgendorff v. Hilgendorff*, 241 A.D.2d 481, 481-482, 660 N.Y.S.2d 150 (N.Y. App. Div.
1997) (*quoting Dodge v. Richmond*, 10 A.D.2d 4, 14, 196 N.Y.S.2d 477, 486 (N.Y. App. Div. 1960)).

31

the allegations in the Complaint. Specifically, BNY point to Brooke's erroneous accounting procedures, commingling of funds, disregard of corporate formalities, and alleged breach of the covenants in sections 5.4, 5.6, and 5.14 of the Master Agent Security Agreements.

Assuming the truth of the allegations, the identified conduct is not sufficient to require dismissal under *in pari delicto*. There is no argument that either Debtors or BASC engaged in willful, illegal, immoral, or unconscionable acts. Of the allegations, only the breach of covenants relate to any of the contract claims. But these allegations of breach of covenants do not show that the Trustee or BASC require the aid of an illegal transaction to make out their case. On the other hand, there are allegations in the Complaint of willful acts by BNY Mellon. The Complaint alleges, based upon the allegations made by Textron in litigation against BNY Mellon, that BNY Mellon was "grossly negligent and acted willfully in its failure to perform under the applicable securitization and warehouse documents."[65] The common law claims shall not be dismissed based upon the affirmative defense of *in pari delicto*.

The Court likewise rejects BNY's similar argument that BASC's admitted contract breaches bar its claims for breach of the Master Agent Security Agreements. The "admitted breaches" relied upon are allegations in the Complaint relating to disregard of the corporate form, failure to keep records and books, and commingling of funds, the same

---

[65] Dkt. 45 at ¶ 157.

Case 10-06245   Doc# 83   Filed 05/15/12   Page 32 of 53

conduct which was presented as grounds for *in pari delicto*. The principle of law relied upon is the general assertion that "[u]nder New York law, a party that breaches a contract cannot bring a breach of contract claim."[66] The Trustee and BASC respond that dismissal on this basis is precluded because whether actions constitute material breaches are questions of fact. The Court agrees.

### D. Some of the breach of contract claims are barred by the terms of the relevant agreements.

#### 1. The Parties' positions.

The heart of the Complaint is the claims for breach of the Master Agent Security Agreements and the Sale and Servicing Agreements for which the Plaintiffs seek recovery of Level III CP fees. BNY assert that most of these contract claims and the related quantum meruit claims are barred by the terms of the contracts. The Plaintiffs respond that issues of fact preclude dismissal.

#### 2. Analysis.

##### a. For some of the breach of contract claims, the Trustee and BASC are not proper parties to sue for breach of contract.

###### (i). Controlling law as to the third-party beneficiary claims.

All of the contracts which are the basis for the breach of contract claims provide they are to be governed and construed in accordance with the laws of the State of New York. Under New York law, "a third party is . . . allowed to enforce a contract if that

---

[66] Dkt. 58 at 26.

Case 10-06245    Doc# 83    Filed 05/15/12    Page 33 of 53

party is an intended beneficiary of the contract."[67]  "The best evidence of the intent to

bestow a benefit upon a third party is the language of the contract itself."[68]  Therefore,

"[w]here a provision exists in an agreement expressly negating an intent to permit

enforcement by third parties, . . . that provision is decisive."[69]  "Under New York law, the

effectiveness of a negating clause to preclude third-party beneficiary status is well-

established."[70]

> **(ii).  The claims of the Trustee for Brooke Corp. as third-party beneficiary against BNY Mellon for breach of the Master Agent Security Agreements for the first six securitizations must be dismissed.**

As stated above, the Master Agent Security Agreements outlined the obligations

owed by the Master Agent (BASC) and the Master Agent Trustee (BNY Mellon).  The

primary purpose of the Master Agent Security Agreements was to insure that all sales

commissions collected on behalf of the Brooke Franchisees whose loans were in the pool

were deposited with the Master Agent Trustee (BNY Mellon) and to direct the Master

Agent Trustee (BNY Mellon) how to disperse those funds to the proper parties.  Under

section 3.3 of the first six Master Agent Security Agreements, a waterfall provided for

distribution of the sales commissions collected by BASC from the insurance companies in

---

[67] *Granite Partners, L.P., v. Bear, Stearns & Co., Inc.,* 58 F. Supp.2d 228, 247 (S.D.N.Y. 1999).

[68] *767 Third Avenue LLC v. Orix Capital Markets, LLC*, 26 A.D.3d 216, 218, 812 N.Y.S.2d 8, 11 (N.Y. App. Div. 2006).

[69] *Nepco Forged Prods. v. Consolidated Edison Co.*, 99 A.D.2d 508, 508, 470 N.Y.S.2d 680, 680 (N.Y. App. Div. 1984).

[70] *India.com, Inc. v. Dalal*, 412 F.3d 315, 321 (2nd Cir. 2005).

34

the following order of priority: (1) Franchise fees retained by BASC-Brooke for franchise administration; (2) loan payments on securitized loans (administered by BNY Asset or Textron); (3) payments on other loans; and (4) net commissions payable to agents. In section 3.4 of the first six the Master Agent Security Agreements, a five-tiered waterfall is established for the payment of the franchise fee portion of the commissions (level 1 in the section 3.3 waterfall) in the following priority: (1) Master Agent trustee fees; (2) Backup Master Agent Servicer fees; (3) Master Agent Servicer reasonable fees and expenses; (4) Master Agent indemnified amounts; and (5) Master Agent. The Plaintiffs contend that collateral preservation fees were included in the third and fifth levels of distributions to the Master Agent, BASC.

For each of these securitizations, the Complaint alleges three claims for breach of the relevant Master Agent Security Agreement by failing to pay Level III CP fees. The first claim is by BASC, a party to the agreements, against BNY Mellon, also a party to them. BNY do not contend this claim by BASC should be dismissed under contract law. The second claim is by the Trustee of Brooke Corp. as a third-party beneficiary of the agreements. The third is by the Trustee of Brooke Corp. as the alter ego of BASC.

BNY contend that the second category of claims must be dismissed because the Master Agent Security Agreements bar suit by Brooke Corp. as a third-party beneficiary. The first six agreements state as follows in section 10.11: "Third Party Beneficiaries. Each of the parties hereto acknowledges and agrees that, other than the Master Agent Secured Parties, there are no third party beneficiaries of the rights of any Person arising

35

hereunder."[71]  Each of these agreements defines "Master Agent Secured Parties" to mean

"the Issuer, the Master Agent Trustee [BNY Mellon], and the Trustee [BNY Mellon as

Trustee], for the benefit of the 'Secured Parties' as defined in the Indenture."[72]  The

Indentures for these securitizations define "Secured Parties" to mean "the Trustee [BNY

Mellon] on behalf of itself and the Noteholders in respect of the Secured Obligations, the

Master Agent Trustee [BNY Mellon], the Servicer [BNY Asset and later Textron], any

subservicer, the Master Agent Servicer [Brooke Corporation] and the Backup Master

Agent Servicer."[73]

The Court holds that the breach of contract claims brought by the Trustee for

Brooke Corp. as a third-party beneficiary of the first six securitizations must be dismissed.

Brooke Corp. was not a party to these Master Agent Security Agreements.  The negating

clauses in the Master Agent Security Agreements preclude third-party beneficiary status.

The clauses unambiguously evidence an intent to limit the third parties who may sue for

breach to the Master Agent Secured Parties, a defined term which does not include Brooke

Corp.  The Master Agent Secured Parties are:  (1) the Issuer; (2) the Master Agent Trustee;

and (3) the Trustee, for the benefit of the Secured Parties.  Although Brooke Corp. as the

Master Agent Servicer is a Secured Party, such parties are not included in the definition of

third-party beneficiaries.  Any benefit for Brooke Corp. must be pursued by the Trustee

---

[71] Dkt. 79-5, 79-15, 79-21, 79-25, 79-30, and 79-39.

[72] *Id.*

[73] Dkt. 79-1, 79-12, 79-20, 79-24, 79-28, and 79-36.

(BNY Mellon) on Brooke Corp.'s behalf.

The Court rejects the Trustee's arguments that the agreements are ambiguous as to third-party beneficiary status. Even if the Plaintiffs were to benefit from the performance of the contracts, the negating clauses clearly state the intent of the parties to the contracts that Brooke Corp. would not have standing to sue for breach.

The Motion to dismiss is granted as to the Trustee's claims for breach of the Master Agent Security Agreements for the first six secutizations.

> **(iii). The claim of the Trustee for Brooke Corp. as third-party beneficiary for breach of the Amended and Restated Master Agent Security Agreement against BNY Mellon for the last securitization must be dismissed.**

The Amended and Restated Master Agent Security Agreement for the last securitization, dated as of August 29, 2006, is similar, but not identical, to the agreements for the first six securitizations. It states:

> Third Party Beneficiaries. The Agent and the Master Agent Secured Parties shall be express third party beneficiaries of this Agreement. Each of the parties hereto acknowledges and agrees that, other than the Agent and the Master Agent Secured Parties, there are no third party beneficiaries of the rights of any Person arising hereunder.[74]

"Agent" is not defined in the Amended and Restated Master Agent Security Agreement, but that agreement uses the definitions in the Amended and Restated Sale and Servicing Agreement, which defines "Agent" as DZ Bank.[75] "Master Agent Secured Parties" is

---

[74] Dkt. 79-63.

[75] Dkt. 79-67.

Case 10-06245   Doc# 83   Filed 05/15/12   Page 37 of 53

defined to mean "the Issuer, the Master Agent Trustee [BNY Mellon, as Trustee], the Agent, and the other 'Secured Parties' as defined in the Credit Agreement."[76] "Secured Parties" is defined in the Credit Agreement to mean "collectively, the Lender, the Agent, the Servicer, the Backup Servicer, the Affected Parties, the Hedge Counterparties, the Indemnified Parties and their respective successors and assigns."[77] None of these includes Brooke Corp.[78]

Brooke Corp. is barred by the terms of the Amended and Restated Master Agent Security Agreement from suing for breach as a third-party beneficiary. That agreement unambiguously omits Brooke Corp. from the list of third parties entitled to enforce the agreement and expressly negates third-party beneficiary status as to all others.

The Motion to dismiss is granted as to the Trustee's claim for breach of the Amended and Restated Master Agent Security Agreement for the BCF Warehouse transaction.

> **(iv). The claims of the Trustee for Brooke Corp. and BASC against BNY Asset for breach of the Sale and Servicing Agreements must be dismissed.**

---

[76] Dkt. 79-63.

[77] Dkt. 79-52.

[78] The entities included in the definition of the "Secured Parties" are: (1) the Lender, Autobahn Funding Company LLC; (2) the Agent, DZ Bank; (3) the Backup Servicer, Portfolio Financial Servicing Company; (4) the "Affected Parties," defined in section 2.10 to mean the Lender, the Agent, and any Funding Source (meaning DZ Bank and any other source of funds); (5) a Hedge Counterparty to a hedge transaction with Brooke Credit Funding, LLC; and (6) "Indemnified Parties," defined in section 8.01 to mean the Agent, the Lender, each Affected Party, each Hedge Counterparty, and each other Secured Party. Dkt. 79-52, 79-53, and 79-54.

As stated above, Defendant BNY Asset acted as initial Servicer for the first three securitizations. The Sale and Servicing Agreements outlined the obligations between the Issuer (the Brooke Securitization SPE), the initial Servicer (BNY Asset or Textron), and the Seller (Aleritas or Brooke Credit Corporation). The primary purposes of the Sale and Servicing Agreements were to sell the Brooke Franchise loans to be securitized to the Issuer, assign the initial Servicer (BNY Asset or Textron) authority to collect and service the Brooke franchise loans, and direct the initial Servicer (BNY Asset or Textron) to instruct the Master Agent Trustee (BNY Mellon) how to distribute the portion of the sales commissions devoted to loan payments. The Plaintiffs' breach of contract claims related to these agreements allege that defendant BNY Asset breached section 4.6(ii) when it failed to set aside and distribute to the Plaintiffs Level III CP fees.

For each of the first three Sale and Servicing Agreements, identical breach of contract claims are alleged against BNY Asset by: (1) BASC as an intended beneficiary of the agreement; (2) the Trustee of Brooke Corp. as an intended third-party beneficiary; and (3) the Trustee of Brooke Corp. as the alter ego of BASC, an intended beneficiary.

Neither Brooke Corp. nor BASC were parties to the Sale and Servicing Agreements. Each agreement addressed rights of third parties as follows:

> Third-Party Beneficiaries; Termination. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns, including the Trustee on behalf of the Noteholders pursuant to the Indenture. Each party hereto hereby acknowledges and agrees that each Noteholder is a third-party beneficiary of, and shall have all rights of enforcement as if such Noteholder was

39

> actually a party to, this Agreement and that, notwithstanding
> any other relevant provision of any Related Document, this
> sentence shall not be amended without the consent of each
> Noteholder.  Nothing in this Agreement, express or implied,
> shall give to any Person, other than the parties hereto, the
> Trustee and the Noteholders and their successors hereunder
> and permitted assigns, any benefit or any legal or equitable
> right, remedy or claim under this Agreement.[79]

Other than parties to the agreements, only the trustee (BNY Mellon) and noteholders are entitled to sue.  Neither Brooke Corp. nor BASC are noteholders.[80]

Therefore under New York law, neither the Trustee for Brooke Corp. nor BASC have any legal or equitable rights under the Sale and Servicing Agreements.  The quoted negating clause clearly and unambiguously expresses the intent that enforcement is to be limited to the parties, the Trustee, and the Noteholders.  Contrary to the Plaintiffs' arguments, the Court finds no ambiguity in this regard.

Moreover, even if the Plaintiffs were proper parties to enforce the Sale and Servicing Agreements, the claims alleging breach of those contracts by failure to set aside and distribute amounts due for Level III CP services would be dismissed.  Under the Sale and Servicing Agreements, BNY Asset served as the initial Servicer in the first three of the seven Brooke securitizations, and Textron acted in this capacity for the last four of the transactions.  A detailed examination of the initial Servicers' obligations was undertaken

---

[79] Dkt. 79-9; 79-18; and 79-23.

[80] "Noteholder" is defined in the Indentures to mean "the Person in whose name a Note is registered on the Note Register."  In other words, a Noteholder is the holder of a security issued under the Indenture.  *E.g.*, Dkt. 79-1.

40

in the Court's Memorandum Opinion granting Textron's motion to dismiss. The Court concluded that the Sale and Servicing Agreements do not address the distribution of Level III CP fees and impose no duty on Textron to make such distributions. The analysis is equally applicable to BNY Asset. BNY Asset did not breach the Sale and Servicing Agreements by failing to distribute Level III CP fees to the Plaintiffs.

### E. The Plaintiffs' quantum meruit claims will not be dismissed.

### 1. The quantum meruit claims.

The Complaint contains seven quantum meruit claims by the Trustee against BNY Mellon and the various SPE Issuers, one for each securitization. It is alleged that Brooke Corp. or Brooke Capital provided valuable services, including collateral preservation services, and incurred expenses for the benefit of BNY Mellon and the relevant SPE, that BNY Mellon had knowledge of the benefit, that BNY Mellon accepted the benefit, and that it would be inequitable for BNY Mellon to retain the benefit without paying Brooke Corp. or Brooke Capital for the value retained. In addition to the general allegations concerning Debtors' business and the securitizations, the factual basis of these claims is a very detailed description of the flow of funds through Brooke bank accounts which, according to the Plaintiffs, shows that Debtors had an interest in the funds transferred to subsidize underperforming franchises.[81]

### 2. The Parties' positions.

---

[81] Dkt. 45 at ¶¶ 130-156.

BNY Mellon argues that these claims should be dismissed because the Master Agent Security Agreements govern the subject matter, the allegations fail to plead a cause of action, and recovery is precluded by Debtors' unclean hands. The Trustee responds that he is not precluded from pleading alternative causes of action, that the allegations include all the elements of a claim for quantum meruit recovery, and that to hold the claims barred by unclean hands would require resolution of issues of fact not appropriate when ruling on a motion to dismiss.

### 3. Analysis.

BNY Mellon initially relies on the principle of New York law[82] that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[83] But this is not an inflexible rule applied to bar the alternative pleading of breach of contract and equitable claims. The New York courts have also stated, "[W]here there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, plaintiff may proceed upon a theory of quantum meruit and will not be required to elect his or her remedies."[84] In this case, although there is no dispute as to the

---

[82] The Trustee responds that Kansas law controls the quantum meruit claims. The Court declines to rule on this contention at this time, since the claim is not subject to dismissal even if New York law is applicable.

[83] Dkt. 58 at 29 (*quoting Clark-Fitzpatrick, Inc., v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190, 193, 521 N.Y.S.2d 653, 656 (1987)).

[84] *IIG Capital LLC v. Archipelago, L.L.C.*, 36 A.D.3d 401, 405, 829 N.Y.S.2d 10, 14 (N.Y. App. Div. 2007).

42

existence of the securitization contracts, since Debtors are not third parties entitled to enforce those agreements, there is a dispute as to whether those contracts would preclude Debtors' claims. Alternative pleading of the breach of contract claims (by BASC and by the Trustee on behalf of Brooke Corp. as the alter ego of BASC) and the quantum meruit claims is permissible.

The argument by BNY Mellon that the quantum meruit claims are barred by Debtors' unclean hands is rejected. Unclean hands is a fact-based affirmative defense which is not a proper ground for a motion to dismiss.[85] A plaintiff is not required to negate an affirmative defense in the complaint.[86] Unclean hands is a fact-dependent defense which cannot be decided as a matter of law at this stage of the proceeding.

### F. The exculpatory clauses of the Master Agent Security Agreements do not require dismissal of the claims.

BNY Mellon's next contract-related defense is the exculpatory clauses in the Master Agent Security Agreements. Those clauses purport to bar any claim against BNY Mellon that does not arise out of its gross negligence or willful misconduct. As to the applicability of the clauses in this case, BNY Mellon argues that the allegations of gross negligence in the Complaint "are simply conclusory and false."[87]

---

[85] *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* 3d, § 1277 at 643-44 (2004) (motion to dismiss not useful vehicle for attacking existence of fact-based affirmative defense such as laches).

[86] *See Redmond v. Progressive Corp. (In re Brooke Corp.)*, __ B.R. __ , 2012 WL 113602, *4 (D. Kan. Jan. 13, 2012) (denying motion to dismiss preference claim based upon ordinary-course affirmative defense).

[87] Dkt. 58 at 32.

43

The Court disagrees. The allegations that BNY Mellon was grossly negligent and acted willfully when failing to perform its duties are based upon the detailed allegations made against BNY Mellon by Textron in other litigation. They are not mere conclusions of wrongdoing without supporting factual allegations. Whether those allegations are false is not a matter to be determined on a motion to dismiss, when the allegations of the Complaint must be "accepted as true."[88]

### G. Debtors' alleged failure to follow contractual provisions for the payment of collateral preservation fees does not void the breach of contract claims.

BNY's last contract-based argument in support of the motion to dismiss is that the Plaintiffs' recovery of collateral preservation fees under a breach of contract theory is barred by their own failure to "comply with the contractual prerequisites for claiming them and thwarting payment by presenting false records."[89] This is a fact-based affirmative defense which is not a proper ground for a motion to dismiss.[90]

### H. The bankruptcy claims for recovery under § 550 of allegedly preferential transfers under § 547 and constructively fraudulent conveyances under § 548 will not be dismissed.

### 1. The Parties' positions.

The bankruptcy claims under §§ 547 and 548 seek to recover primarily transfers of funds used to make loan payments that underperforming agents and franchisees owed on

---

[88] *Iqbal*, 556 U.S. at ___, 129 S.Ct. at 1949.

[89] Dkt. 58 at 33.

[90] See 5 *Federal Practice and Procedure: Civil* 3d, § 1277 at 643-44.

the various securitized and warehoused loans, which payments were made or directed to be made by BNY Mellon from the Master Receipts Trust Account (MRTA).[91]  BNY Mellon moves to dismiss on the basis that:  (1) the Trustee has not pleaded facts showing Debtors had an interest in the property transferred, (2) there are no allegations that such property was transferred to any Defendants, and (3) BNY Mellon acted as a mere conduit and cannot be liable as a transferee.  Further, as to the preference claims, BNY Mellon submits that the transfers were made on account of debts of the franchisees, not Debtors, and that BNY Mellon was not an insider of Debtors.  The Trustee opposes each of these arguments.

### 2.  Analysis.

### a.  The Complaint alleges the transfers were property in which Debtors Brooke Corp. or Brooke Capital had an interest.

BNY Mellon's argument regarding the failure to allege an interest of Debtors in the transferred property relies upon the following facts stated in the Complaint:  Debtors assigned their rights under the franchise agreements and the Collateral Preservation Agreements to BASC; and under the Master Agent Security Agreements, the MRTA was the property of BASC.  These facts are alleged in the Complaint, but they are an incomplete recitation of the facts alleged that are relevant to the avoidance recovery claims.

The Trustee also alleges facts from which the Court concludes it is plausible that Debtors had an interest in the property transferred, notwithstanding BASC's role.  The

---

[91] The allegations also refer to a $313,172.45 wire transfer from a Brooke Capital account on September 15, 2008, to the MRTA.  This transfer was discussed during oral argument.  Since there appeared to be agreement that this portion of the bankruptcy claims against BNY Mellon is moot, the Court will not address the transfer in this opinion.

Complaint alleges that there was a massive commingling of funds belonging to Brooke Capital and Brooke Corp. in the Consolidated Receipts Trust Account (CRTA), which was titled in the name of BASC, and that funds in the CRTA were transferred to the MRTA.[92] And the Complaint alleges Brooke Corp. disregarded BASC's corporate existence to such an extent that BASC was the alter ego of Brooke Corp.[93] Therefore, according to the Complaint, when funds from the CRTA were transferred to the MTRA and then used to make loan payments, the transfers included transfers of an interest of Brooke Corp. or Brooke Capital.[94] As to the MRTA itself, the Trustee alleges that under the Master Receipts Trust Account Agreement,[95] the agreement governing the MRTA, BASC transferred exclusive ownership, dominion, and control of the MRTA to BNY Mellon, as trustee on behalf of certain secured parties. The Complaint further alleges that BNY Mellon made loan payments with a portion of the funds in the MRTA which it should have returned to Brooke.[96]

The Court declines to dismiss the fraudulent transfer and preference claims on the basis that Debtors Brooke Corp. and Brooke Capital had no interest in the funds sought to be recovered.

---

[92] Dkt. 45 at ¶¶ 138, 147, and 150.

[93] *Id*. at ¶¶ 24, 144, 145, 146, and 152.

[94] *Id* at 152.

[95] Dkt. 58-6.

[96] Dkt. 45 at ¶¶ 150, 151, 152, 153, and 155.

46

**b. Whether BNY Mellon was a mere conduit cannot be determined based upon the pleadings and related documents.**

BNY Mellon submits that the bankruptcy claims must be dismissed because it was a mere conduit and therefore, under § 550, has no liability as a transferee.

As to transfers avoided under § 547 and § 548, § 550(a)(1) makes the initial transferee and the entity for whose benefit the transfer was made strictly liable. The Bankruptcy Code does not define "initial transferee." The Tenth Circuit has adopted a "dominion or control" test.[97] Under that test, "'the minimum requirement of status as a "transferee" [under § 550] is dominion over the money or other asset, the right to put the money to one's own purposes.'"[98] An entity that first received an avoided transfer but that does not satisfy the initial transferee test is deemed to have acted as a conduit and not to be strictly liable under § 550(a).

The Court denies the motion to dismiss based upon the conduit argument. First, under the foregoing test, the allegations of the Complaint — when considered in light of the securitization documents — show the presence of factual controversies which preclude dismissal. This is illustrated by the parties' dispute over the construction of the Master Receipts Trust Account Agreement, the agreement which controls the MRTA.[99] BNY

---

[97] *Malloy v. Citizens Bank (In re First Security Mortg. Co.)*, 33 F.3d 42, 43-44 (10th Cir. 1994).

[98] *Id.* at 43-44 (*quoting Bonded Financial Servs, Inc., v. European Am. Bank,* 838 F.2d 890, 893 (7th Cir.1988)).

[99] Parties to the Master Receipts Trust Account Agreement, dated August 27, 2004, are: BASC; Brooke Captive Credit Company 2003, LLC; Brooke Securitization Company 2004-A, LLC; Brooke Acceptance Company, LLC; Bank of New York (predecessor to BNY Mellon), Trustee; and Bank of New York (predecessor to BNY Mellon). Dkt. 58-6.

47

Mellon relies on this agreement to support its primary argument in support of its conduit

status — that the MRTA was owned by BASC and that BASC exercised dominion and

control over it, since under the agreement, it was BASC that directed the transfers that were

made out of the MRTA. The Trustee responds that BNY Mellon's position ignores the

basic provisions of the MRTA Agreement which, in the first sentence, states that BASC, as

Master Agent, "hereby transfers exclusive ownership, dominion and control of its Master

Receipts Trust account . . . maintained with [BNY Mellon, successor to the Bank of New

York] to the Bank of New York . . . as trustee . . . on behalf of certain secured parties." The

Trustee also quotes the following part of a paragraph of the agreement:

> The Master Agent [BASC] also hereby notifies you
> [BNY Mellon in its individual capacity] that notwithstanding
> anything herein or elsewhere to the contrary, the Trustee [BNY
> Mellon], or any party designated in writing by the Trustee, shall
> be irrevocably entitled to exercise any and all rights in respect
> of or in connection with the funds on deposit in the Master
> Receipts Trust Account, including, without limitation, the right
> to specify when payments are to be made out of or in
> connection with such deposits in the Master Receipts Trust
> Account.[100]

In response, BNY Mellon submits that the Trustee misinterprets the MRTA

Agreement. It cites a provision which states that the Master Agent directs BNY Mellon "to

transfer all collected and available funds in the Master Receipts Trust Account in

accordance with the instructions of the Master Agent [BASC]," until receipt of a notice of

---

[100] Dkt. 58-6 at 2.

termination of the Master Agent's access to the account.[101]  BNY Mellon further submits

that the paragraph quoted above on which the Trustee relies is applicable only after a notice

of termination, which was never given.  The Court finds the MRTA Agreement to be

sufficiently ambiguous that it cannot support dismissal based upon the contention that BNY

Mellon was a conduit rather than an initial transferee.

Further, even if the MRTA Agreement were not ambiguous and the Court could

conclude that BNY Mellon did not have dominion over the MRTA under the MRTA

Agreement, it would deny the motion to dismiss.  The Court concludes that whether BNY

Mellon had dominion over the MRTA funds cannot be determined based solely upon the

MRTA Agreement.  Rather, a thorough examination of the relationships resulting from the

securitizations will be necessary.  When adopting the "dominion *or* control" test, the Tenth

Circuit relied on *Bonded*,[102] a Seventh Circuit case.  As stated above, that test focuses on

the legal right of the transferee to use the funds for its own purposes.  Later, in *Rupp*,[103] the

Tenth Circuit described the test as "dominion *and* control" and analyzed the issue of

conduit status based in part upon control, rather than just dominion.  Control was not a

factor addressed in *Bonded*.  Rather, the control test is often stated to have originated in the

Eleventh Circuit's decision in *Chase & Sanborn*.[104]  Under that test, persons who receive

---

[101] *Id*. at 1.

[102] *Bonded Financial Servs., Inc., v. European Am. Bank*, 838 F.3d 890, 893 (7th Cir. 1988).

[103] *Rupp v. Markgraf*, 95 F.3d 936, 938-43 (10th Cir. 1996).

[104] *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir. 1988).

49

funds from the debtor are not treated as initial transferees if they never actually controlled the funds. Application of the test requires courts "to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable."[105] The Tenth Circuit has cited *Chase & Sanborn* as well as *Bonded* when discussing the conduit exception to initial transferee status.[106] Recently, in *Paloian*,[107] Judge Easterbrook, who also authored *Bonded*, held that a bank that received transfers as a trustee subject to duties to distribute the funds to trust beneficiaries was nevertheless an initial transferee. In part, the analysis was equitable and based upon the practical aspects of the litigation.

In *Northern Capital v. Stockton National Bank*,[108] this Court granted a motion for partial summary judgment, holding that a lead bank was a conduit, rather than an initial transferee, as to those portions of allegedly preferential payments made by the debtor that the lead bank had transmitted to participants in accordance with participation agreements. The conduit issue was presented on uncontroverted facts, which allowed the Court to examine not only the controlling documents but also the precise transfers in issue and the transactions as a whole, to be certain that the conclusion was logical and equitable. In this case, likewise, BNY Mellon's conduit status will depend upon analysis not only of the

---

[105] *Id.*

[106] *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1202 (10th Cir. 2002); *see also Xeta Corp. v. Canton Indus. Corp.*, 132 F.3d 44 (table), text available at 1997 WL 770941, *3 (10th Cir. 1997) (unpublished opinion citing *Chase & Sanborn*).

[107] *Paloian v. LaSalle Bank*, 619 F.3d 688, 691-692 (7th Cir. 2010).

[108] *Northern Capital v. Stockton Nat'l Bank (In re Brooke Corp.)*, 458 B.R. 579, 586-91 (Bankr. D. Kan. 2011).

50

MRTA Agreement and other transaction documents, but of the transactions as a whole.

The Court further notes that conduit status is customarily determined on motions for summary judgment or after trial.[109] "Whether a transferee is an initial transferee or conduit is a fact intensive inquiry."[110] Yet, at this stage of this case, the Court has only the barest outline of how the transactions were supposed to occur and essentially no information about how the transactions in fact did occur. BNY Mellon does not explain why this issue should be decided on a motion to dismiss.

### c. The Court rejects BNY's argument that the preference claims should be dismissed because the transfers in issue were made on account of debts of the franchisees, not of a Debtor.

Section 547(b)(2) includes as an element of a preferential transfer that the transfer be of an interest of the debtor in property "for or on account of an antecedent debt owed by the debtor before such transfer was made." BNY contend that the antecedent debts alleged to have been satisfied by the transfers were the amounts owed by the Brooke franchisees on the securitized loans, and these were not debts of any of Debtors. The Trustee responds that: (1) in § 101(12), the Bankruptcy Code defines "debt" as "liability on a claim," (2) "claim" is very broadly defined in § 101(5), and (3) whether the transfers satisfied

---

[109] *E.g.*, *Ogden*, 314 F.3d at 1195 (summary judgment ruling); *First Security Mortg.*, 33 F.3d at 43-44 (presumably after trial; appellate opinion does not mention motion to dismiss or for summary judgment); *Paloian*, 619 F.3d at 690-91 (ruling after trial); *Universal Serv. Admin. Co., v. Post–Confirmation Committee of Unsecured Creditors (In re Inconnet, Inc)*, 463 F.3d 1064, 1067-68 (9th Cir. 2005) (summary judgment ruling); Chase & Sanborn, 848 F.2d at 1196-97 (ruling after trial); *Bonded Financial Servs.*, 838 F.2d at 891 (summary judgment ruling).

[110] *In re Brooke Corp.*, 458 B.R. at 585.

51

antecedent debts of Debtors will depend upon (a) whether BASC was the alter ego of Brooke and (b) the relationships established by the securitization documents.

Given the complexity of the transactions and the allegations of the Complaint, the Court finds it plausible that the transfers satisfied antecedent debts of Debtors.

### d.  Whether BNY Mellon is an insider will not be determined on a motion to dismiss.

Finally, as to the preference claims, BNY Mellon argues it was not an insider and therefore the one-year look-back provision of § 547(b) does not apply.  The Trustee's allegations regarding insider status rely upon a two-step analysis.  First, it is alleged that the SPEs to which the franchisee loans were transferred were affiliates of Debtors and therefore statutory insiders.  Next, it is alleged that BNY Mellon, as Master Agent Trustee for those affiliates, was granted a high level of control of the affiliates, such that it was an insider of the affiliates, thereby satisfying the definition in § 101(31)(E) of an "insider" of Debtors.

Whether an entity satisfies the § 101(31) definition of "insider" based upon control requires consideration of the "specifics of their dealings."[111]  The Trustee's allegations are plausible.  The preference claim as to transfers made more than 90 days prepetition will not be dismissed on the basis that BNY Mellon was not an insider.

### I. The Trustee's accounting claim will not be dismissed.

BNY move to dismiss the accounting claim, asserting that such claims are not allowed under New York law in the absence of a fiduciary relationship, which is not

---

[111] *Rupp v. United Security Bank (In re Kunz)*, 489 F.3d 1072, 1080 (10th Cir. 2007).

alleged here.  But BNY overstate the New York rule.  Under New York law, an accounting may also be ordered "where special circumstances are present warranting equitable relief in the interest of justice."[112]

The Court finds that such circumstances could be present in this case.  It is too early in the litigation for the Court to rule out the possibility of such relief.

**CONCLUSION.**

For the foregoing reasons, the Court dismisses the claims of the Trustee against BNY Mellon for breach of the Master Agent Security Agreements for the seven securitization transactions (Counts 3-4; 10-11; 17-18; 24-25; 30-32; 37; 43-44), and the claims of the Trustee and BASC against BNY Asset for breach of the Sale and Servicing Agreements for the first three securitizations (Counts 5-7; 12-14; and 19-21).  The Motion to dismiss is denied as to all other claims, including the claims of BASC for breach of the Master Agent Security Agreements.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, which makes Rule 52(a) of the Federal Rules of  Civil Procedure applicable to this proceeding.

**IT IS SO ORDERED.**

# # #

---

[112] *Grossman v. Laurence Handprints-N.J., Inc.*, 90 A.D.2d 95, 104, 455 N.Y.S.2d 852, 858 (N.Y. App. Div. 1982) (*citing Merchants Importing, Inc., v. Kuhn & Schneider, Inc.*, 27 A.D.2d 709, 276 N.Y.S.2d 923 (N.Y. App. Div. 1967)); *Kaminsky v. Kahn*, 23 A.D.2d 231, 259 N.Y.S.2d 716 (N.Y. App. Div. 1965)).